Alexandra (Sasha) V. FUTRAN,
Plaintiff,

v.

RING RADIO COMPANY, Defendant.

Civ. A. No. C 79–1593 A.

United States District Court,
N. D. Georgia,
Atlanta Division.

Sept. 25, 1980.

Mary Ann B. Oakley, Alice D. Bonner, Atlanta, Ga., for plaintiff.

John R. Crenshaw, Anne S. Rampacek, Alston, Miller & Gaines, Atlanta, Ga., for defendant.

## MEMORANDUM OPINION AND ORDER

VINING, District Judge.

The plaintiff brought this action under the Equal Pay Act of 1963, 29 U.S.C. § 206(d), and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*; pendent jurisdiction was asserted over the plaintiff's claim for breach of contract under Title 20 of the Georgia Code. The case was tried by the court sitting without a jury on April 23, 1980. Post–trial briefs were filed by the parties on July 25, 1980. The following will constitute the court's findings of fact and conclusions of law as required by Rule 52, Federal Rules of Civil Procedure.

### I. FACTS

The plaintiff, Alexandra (Sasha) Futran, was employed by the defendant, RING Radio Company, as a "ringmaster" (talk show host) on September 12, 1977. Her background prior to employment at RING Radio included approximately two years at a liberal arts college and some experience in sales, summer stock, writing, and community activities. Most important was her activity during the months preceding RING Radio's full time employment of her, *viz.*, filling in at RING Radio for vacationing ringmasters.

At the time she accepted RING Radio's offer to become a ringmaster, Ms. Futran and the defendant's Vice President and General Manager, Harry Davey, discussed her job functions and terms of employment at great length. The starting salaries for ringmasters were determined through negotiation between the defendant's general manager and the prospective ringmaster. Ms. Futran's salary was to be $12,000 annually,

with the possibility of a bonus based on her ratings. In addition, she was promised a substantial increase in pay if her ratings were good when the fall rating book was published the next January and a slight increase if her ratings were slightly improved; however, she would be fired if her ratings were down. (The ratings are based on Arbitron rating books.)

When Ms. Futran expressed amazement at how low her salary would be, Mr. Davey told her that Wallis "Chip" Wood, who would also begin working as a ringmaster on September 12, 1977, would be earning a salary "in the same ballpark." Mr. Wood, however, was hired as a ringmaster at an annual salary of $21,000, with the same kind of bonus agreement that the station had with Ms. Futran; he was also given an automobile for his use through November 1977 and received $1,500 for moving expenses. He was told by Mr. Davey not to discuss his salary with other employees.

Mr. Wood's background includes two years of college and extensive experience in writing and in public speaking, for several years he directed the Speakers Bureau of the John Birch Society, and reflects better job stability than Ms. Futran's. Just prior to accepting his position at RING Radio, Mr. Wood served as the General Manager and President of a California-based publishing firm specializing in political and economic commentaries.

Because Mr. Wood had no previous broadcast experience, Mr. Davey invited him to "guest host" a show, which was taped for review by Mr. Davey. Mr. Davey testified that he considered Mr. Wood's performance to be the best he had ever heard by a non-experienced broadcaster auditioning on RING Radio. Ms. Futran's air sound was found to be good but not as good as Mr. Wood's guest host performance. However, Mr. Davey also recognized that all ringmasters vary considerably in the quality of their performance over a period of time and that even the best ringmaster can do very poor shows.

During the plaintiff's discussion with Mr. Davey concerning the terms and conditions of her employment, Mr. Davey informed her that their oral agreement would be prepared in written form for her to sign before she began work on September 12. Despite several requests by the plaintiff, no written contract was presented to her until October 1977, after she had been working full time for several weeks.

When the contract was finally tendered in mid–October, it contained terms not previously discussed by the parties, including a stringent covenant not to compete, and omitted terms that had been discussed; consequently, Ms. Futran refused to sign the written contract. Diane Raymond, the individual replaced by Ms. Futran, was also to have signed a contract of employment with the defendant, but the defendant has no record of such a contract being signed by her, and her failure to sign a contract did not result in her termination.

The males at RING Radio earned more than the females as a group, and all individual males, except one, earned more than the individual females during 1977–1978. Jane Simons, who was replaced by Mr. Wood, was earning a maximum of $14,560 per year as a "talent" (non–contract) employee of the defendant. She broadcast from 9:00 a. m. until 11:00 a. m., the same hours during which Mr. Wood broadcasts. Ms. Raymond earned $15,000 annually plus a car and broadcast from 1:00 p. m. until 3:00 p. m., the same hours during which Ms. Futran broadcast. Wally Kennedy was paid $30,000 for his show during the midday period.

Personal endorsements were a source of revenue for the station and the individual ringmaster. The experience at RING Radio was that the conservative ringmasters were called on more often for personal endorsements than liberal ringmasters. Whereas Mr. Wood was deemed by RING Radio to be extremely conservative, Ms. Futran was deemed to be liberal, but as the only female ringmaster, Ms. Futran was the only woman available for endorsements; both received the same amount for endorsements when they began broadcasting for the defendant.

Due to illness Ms. Futran missed several days of the fall 1977 rating period. When the rating books arrived in January 1978, Mr. Wood placed third in one rating category and received a $300 bonus as a result of that rating. Ms. Futran was later to discover that she had placed second in two separate rating categories but, nevertheless, was told by Mr. Davey on the day that the rating books arrived at the station that she did not earn a bonus. When she again inquired in January about her ratings, Mr. Davey informed her that there had been no significant change and added that he did not feel she was doing a good job and was disappointed in her. At one point Mr. Davey suggested that she spend more time on preparation and less time on feminism. In contrast, others in the station, including her immediate supervisor (Program Director Dave Watkins), had on several occasions told Mr. Wood to observe Ms. Futran and use her as a model. It is interesting to note that Mr. Davey wrote a highly complimentary letter of recommendation on her behalf following her termination.

Despite numerous requests, Ms. Futran was unable to obtain a salary raise and was unable to discover what her ratings were. After termination the plaintiff learned that she had been entitled to a bonus based on her ratings.

After Ms. Futran had refused to sign the written contract which she was given in the fall of 1977, neither she nor Mr. Davey mentioned it again until March 31, 1978. On that date she was asked to type up promotional materials that advertised all other ringmasters' programs and public service announcements on index cards to be read on the air by all ringmasters and was asked to be in charge of maintaining the files, writing the material, and rotating announcements throughout the day. She refused to perform these functions, which she considered to be essentially clerical, and she also informed Mr. Davey that she considered the assignment discriminatory. At the time Ms. Futran was asked by Mr. Davey to perform these clerical tasks, she was the only female ringmaster at RING Radio and the only ringmaster asked to do such work. (The male ringmasters were not directed to perform such clerical tasks involving other than their own shows.)

During Ms. Futran's entire period of employment with RING Radio, she did a number of volunteer tasks of a professional nature, including recording public service announcements, recording all commercials requiring a female voice, research, promotions, and special programming. She had never before refused an assignment.

Just before Ms. Futran was asked to do the announcements, the receptionist, Ms. Seretha LeMon, had asked if she could be allowed to do them, since she had some free time and, in any event, she received the questions from listeners about them. Ms. LeMon had extensive writing experience and had done the announcements in the past. Her offer was refused.

After Ms. Futran declined to perform the essentially clerical duties, she was asked to meet with Mr. Davey and Mr. Watkins; she was told that she would have to perform these tasks or leave; she was further told that she would have to sign the contract or leave. During that discussion, on March 31, 1978, she was presented with a new written contract almost identical to the prior written one which she had previously refused to sign. During the discussion, Ms. Futran stated that because Mr. Davey was not satisfied with her performance and indicated that she would be fired unless the rating book coming out in July reflected significant improvement, she did not want to "sign away" the next two years of her life under a clause containing a covenant not to compete within a fifty mile radius for that period of time. The lengthy meeting concluded with a suggestion from Mr. Davey that both of them think about the matter over the weekend. The next discussion was in the form of an exchange of memos between Mr. Davey and Ms. Futran, in which Mr. Davey terminated Ms. Futran's employment. The court finds that her failure to perform the essentially clerical tasks was the principal reason for her termination. Her last day of work was April 7, 1978.

Shortly thereafter, Ms. Futran learned that she had placed second in two rating categories in the fall rating book. She was, therefore, entitled to a $1,000 bonus check. On May 8, 1978, the plaintiff called Mr. Davey and pointed out the bonus situation to him. She received her bonus check the following day. At about that same time, Ms. Futran first learned that Mr. Wood was being paid $9,000 a year more than she to do work which was substantially equal in skill, effort, and responsibility.

On September 28, 1978, within 180 days of her termination by the defendant, Ms. Futran filed a charge of sex discrimination with the Equal Employment Opportunity Commission (EEOC). On August 9, 1979, the EEOC issued a Notice of Right to Sue to Ms. Futran, and within 90 days thereof she filed the action *sub judice*, in which she seeks to recover compensatory damages of $9,000 (the difference in pay between her salary and Mr. Wood's) together with liquidated damages of $9,000 under the Equal Pay Act, back pay under Title VII in the amount of $3,685, representing (after deducting the amount she earned in mitigation) the remainder of her $12,000 salary which she would have earned had she not been wrongfully terminated on April 7, 1978, reasonable attorney's fees, and costs.

## II. ANALYSIS

### A. *Equal Pay Act Violation*

■ Congress enacted the Equal Pay Act provision of the Fair Labor Standards Act, 29 U.S.C. § 206(d), to remedy what it perceived to be "a serious and endemic problem of employment discrimination in private industry–the fact that the wage structure of 'many segments of American industry has been based on an ancient but outmoded belief that a man, because of his role in society, should be paid more than a woman even though his duties are the same.'" *Corning Glass Works v. Brennan*, 417 U.S. 188, 195, 94 S.Ct. 2223, 2228, 41 L.Ed.2d 1 (1974), quoting S.Rep.No.176, 88 Cong., 1st

Sess., 1 (1963). The Act prohibits an employer from paying different wages to employees of opposite sexes "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." A plaintiff establishes a prima facie case by a showing of the foregoing circumstances. *Corning Glass Works v. Brennan, supra; Pearce v. Wichita County*, 590 F.2d 128 (5th Cir. 1979). After a plaintiff establishes a prima facie case, the burden of going forward with the evidence is then placed on the employer to show that the wage differential is justified under one of the Act's four exceptions: where different payment to employees of opposite sexes "is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." 29 U.S.C. § 206(d)(1).

The defendant concedes that the plaintiff has established a prima facie case:

> There is no question in this case that Mr. Wood and Ms. Futran did substantially the same work. They were both performing the job of ringmaster. Given these facts, the Plaintiff has established a prima facie case, and Defendant has the burden of justifying the differential.

Defendant's post–trial brief at 7. The defendant has attempted to prove only the last exception to the Act, *viz.*, "a differential based on any other factor other than sex."

■ "[T]he burden of proving that a factor other than sex is the basis for a wage differential is a heavy one," *Brennan v. Owensboro–Daviess County Hospital*, 523 F.2d 1013, 1031 (6th Cir. 1975), *cert. denied*, 425 U.S. 973, 96 S.Ct. 2170, 48 L.Ed.2d 796 (1976), and the requirements for this exception are not met "unless the factor of sex provides no part of the basis for the wage differential." 29 C.F.R. § 800.142 (1979); [1]

---

1. "While the regulations published by the Secretary of Labor interpreting the Equal Pay Act are not binding upon the courts, *Brennan v. City Stores, Inc.*, 479 F.2d 235, 239–40 (5th Cir. 1973), they should be given great weight, *Hodgson v. Security National Bank*, 460 F.2d 57, 59

*Brennan v. Owensboro–Daviess County Hospital, supra,* at 1031. The court concludes that the defendant has not met its burden.

In its post–trial brief the defendant states: "At first blush, it might appear that it is hard to justify hiring two individuals, neither of whom have [*sic*] had previous broadcast experience and paying one a starting salary of $21,000 and the other a starting salary of $12,000." Defendant's post–trial brief at 8–9. The court agrees with that statement but finds the salary differential difficult to justify in the final analysis as well. While the defendant lists several factors "other than sex" which it claims to have considered in determining the starting salaries of its ringmasters, even taken as a whole these factors do not justify the disparity between Ms. Futran's starting salary and Mr. Wood's.

■ The court is willing to acknowledge that Mr. Wood's background reflected superior job stability and jobs with greater public contact. Mr. Wood may also have shown greater potential by virtue of his guest host performance as a ringmaster. These are factors "other than sex" which the court finds played a role in the greater salary paid to Mr. Wood. The defendant further asserts that as a conservative Mr. Wood's potential for generating greater revenue for the station through endorsements constitutes an important factor "other than sex." "Economic benefits to an employer can justify a wage differential." *Hodgson v. Robert Hall Clothes, Inc.,* 473 F.2d 589, 594 (3d Cir.), *cert. denied,* 414 U.S. 866, 94 S.Ct. 50, 38 L.Ed.2d 85 (1973). Neverthe-

less, even taken cumulatively the foregoing factors do not form the basis for the wide disparity in salaries.[2] Perhaps, if the revenue generated for the station from personal endorsements by Mr. Wood became so much greater than that generated by Ms. Futran, it could explain a difference in raises during the course of employment, but it does not justify the large gap in their starting salaries. *See Pearce v. Wichita County, supra.* If the foregoing factors were coupled with Mr. Wood's possessing significant broadcast experience, the court would be more inclined to find that the disparity was due completely to factors "other than sex," but he did not possess any prior broadcast experience.

■ Instead, what the court does find is that much of the difference in salaries can be attributed to the plaintiff's sex. As stated previously, the requirements for the exception based on factors "other than sex" are not met "unless the factor of sex provides no part of the basis for the wage differential." Here, RING Radio paid Mr. Wood what was necessary to attract him to its station; it did the same with Ms. Futran, but it took considerably less money to attract her (based at least in part on her inferior bargaining position as a woman). However, paying a lesser rate simply because the market will bear that rate is impermissible under the Equal Pay Act. "Just such disparities were what Congress intended to correct by this legislation." *Brennan v. City Stores, Inc.,* 479 F.2d 235, 241 n.12 (5th Cir. 1973). In *Hodgson v. Brookhaven,* 436 F.2d 719 (5th Cir. 1970), the Fifth Circuit noted that the employer's

(8th Cir. 1972)." *Pearce v. Wichita County,* 590 F.2d 128, 133 n.7 (5th Cir. 1979). "The presumption is that they are valid unless shown to be erroneously in conflict with the act itself." *Brennan v. City Stores, Inc., supra* at 240 (5th Cir. 1973). No such showing has been attempted by the defendant.

**2.** Even accepting the defendant's position that the different broadcast time slots was a factor, the court reaches this same conclusion. However, the court does not find it to be a factor,

since the record reflects no correlation between starting salary and broadcast time. Additionally, in the consolidated pre–trial statement, "previous rate of pay" was listed as a factor by the defendant; however, to give more than nominal consideration to such a factor would serve to perpetuate the historic employment discrimination in wages suffered by females in the work force. *See Neely v. MARTA,* Civil Action File No. C77–270A (N.D.Ga. Nov. 8, 1979).

greater bargaining power with respect to women is not the kind of factor "other than sex" that Congress had in mind. The court concluded: "Thus, it will not do for the hospital to press the point that it paid [male] orderlies more [than female aides] because it could not get them for less." *Id.* at 726. Hence, this court finds that the defendant did not meet its burden of proving that the differential was based on a factor "other than sex." Consequently, the court finds that the defendant violated the Equal Pay Act with respect to Ms. Futran; she is, therefore, entitled to the $9,000 salary difference as full compensation for her injury under the Act.

Ms. Futran also seeks an equal amount as liquidated damages. Liquidated damages in the amount of the compensatory damages shall be recovered by an employee under 29 U.S.C. § 216(b) of the Fair Labor Standards Act, but

> if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act of 1938 ... the court may in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in section 16 of such Act.

29 U.S.C. § 260.

Thus, the granting of liquidated damages is mandatory except where the employer shows to the satisfaction of the court that his act or omission was in "good faith" and was based upon reasonable grounds for believing that he was not violating the Act, in which case the decision whether to award liquidated damages is left to the sound discretion of the district court. 29 C.F.R. § 790.22; *Weisel v. Singapore Joint Venture, Inc.*, 602 F.2d 1185, 1191 n.18 (5th Cir. 1979); *Pearce v. Wichita County, supra*;

and *Hays v. Republic Steel Corp.*, 531 F.2d 1307 (5th Cir. 1976).

■ Here, the defendant has failed to show to the court's satisfaction that the two prerequisites have been met. It has merely shown that some factors "other than sex" contributed to the differential; however, such factors were not intended to provide a "good faith" defense to a clear violation of the Act.[3] *Hodgson v. American Bank of Commerce*, 447 F.2d 416 (5th Cir. 1971). The defendant, through its agent Harry Davey, was aware that the Equal Pay Act "was in the picture," and impermissibly determined wages by basing them principally upon what the market would bear. The court finds the violation in the case *sub judice* to be willful and, therefore, finds that the defendant failed to satisfy the prerequisites which would trigger the exercise of the court's discretion (which, in any event, the court would exercise to require the payment of liquidated damages equal in amount to the compensatory damages). Consequently, the plaintiff is also entitled to recover liquidated damages in the sum of $9,000.00.

### B. *Title VII Violation*

■ A violation of the Equal Pay Act is also a violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq. See* 42 U.S.C. § 2000e-2(h); *Burdine v. Texas Department of Community Affairs*, 608 F.2d 563 (5th Cir. 1979); and *Orr v. Frank R. MacNeill & Son, Inc.*, 511 F.2d 166 (5th Cir. 1975).

For violating Title VII the plaintiff is entitled to the difference between what she would have earned and what she actually did earn through September 11, 1978. Her $12,000 annual salary would have paid her an additional $5,000 from April 7 to September 11, but Ms. Futran testified that she earned $1,315 in mitigation, so that an

---

**3.** Further evidence of the defendant's lack of good faith was Mr. Davey's response to Ms. Futran's expressed amazement at how low her salary was, to wit, that her salary would be comparable to Mr. Wood's.

award of back pay under Title VII in the amount of $3,685 is warranted.

■ The court also notes that it finds, in addition to the equal pay discrimination, that the defendant discriminated against Ms. Futran on the basis of her sex in asking her to add to her job essentially clerical duties that males were not similarly requested to perform [4] and in the retaliatory termination of her employment when she protested the assignment of clerical duties as discriminatory. Thus, the court finds that her termination was the result of a refusal to accept, and objection to, the assignment of the clerical tasks and not her failure to execute the written contract as the defendant asserts.[5] The court further finds that her protest to the assignment was a protected activity. *See generally Hochstadt v. Worcester Foundation*, 545 F.2d 222 (1st Cir. 1976). Although the aforementioned discriminatory acts constitute violations of Title VII, the court has already granted the plaintiff's prayer thereunder for full back pay because of the defendant's equal pay discrimination; therefore, the additional violations do not serve to increase the amount of back pay awarded.

C. *Breach of Contract under Title 20 of the Georgia Code*

The plaintiff has also sued for breach of contract under Title 20 of the Georgia Code, a claim over which the court accepted pendent jurisdiction. Since the plaintiff has been fully compensated under the Equal Pay Act and Title VII of the Civil Rights Act, the court need not address this alternative claim for relief.

III. *CONCLUSION*

In sum, the court finds for the plaintiff in the amount of $9,000 in compensatory damages and $9,000 in liquidated damages under the Equal Pay Act; $3,685 as back pay under Title VII; and costs and reasonable attorney's fees. Both the Equal Pay Act, 29 U.S.C. § 216(b), and Title VII, 42 U.S.C. § 2000e–5(k), provide for reasonable attorney's fees. If the parties cannot agree within thirty days from the date of this order on an amount as reasonable attorney's fees for the plaintiff, the plaintiff's attorney is directed to submit to the court by affidavit evidence of time spent and evidence of the other factors set out in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974). If issues of fact still remain disputed concerning reasonable attorney's fees, the court will hold an evidentiary hearing to facilitate their resolution. *King v. McCord*, 621 F.2d 205 (5th Cir. 1980).

So Ordered.

---

**4.** The male ringmasters were not given substantial clerical responsibilities outside of their own shows; whereas, Ms. Futran was directed to type and catalogue all public service announcements and promotional materials.

**5.** Ms. Futran had refused to sign the contract when it was presented to her six months earlier, and she again refused to sign it in January 1978. Approximately three months had passed when she told Mr. Watkins that she would not perform the clerical work. She was directed to Mr. Davey's office where he informed her that she would have to leave if she did not perform the new tasks and further informed her that she would have to leave if she did not sign the contract. Her employment was terminated shortly thereafter. The defendant's contention that her failure to sign the contract was the sole basis for her termination is belied by evidence consisting of, *inter alia*, the aforementioned facts, the "coincidental" timing of her termination with her refusal to perform the clerical work, and the fact that Ms. Raymond was not fired for failing to sign the standard contract.