**Ann ROGERS, Plaintiff,**

v.

**John O. MARSH, Jr., Secretary of the Army, Defendant.**

**No. PB–C–82–106.**

United States District Court,
E.D. Arkansas,
Pine Bluff Division.

Oct. 27, 1983.

John G. Lile, Ramsay, Cox, Lile, Bridgforth, Gilbert, Harrelson & Starling, Pine Bluff, Ark., for plaintiff.

John S. Albanese, Civilian Personnel Litigation, Dept. of the Army, Washington, D.C., for defendant.

## FINDINGS OF FACT

ROY, District Judge.

1. The plaintiff, Ann Rogers, a white female, has brought this action under the authority of 42 U.S.C. § 2000e, *et seq.* alleging that her employer, the Department of the Army Pine Bluff Arsenal, denied her the Housing Project Manager's position because of her sex. Although initially filed as a class action, those claims were dropped. The plaintiff seeks back pay, to be made whole as a result of the alleged

practices, to enjoin her employer from further discrimination and attorneys' fees and costs.

2. The Pine Bluff Arsenal (the "Arsenal") is a materials production facility at Pine Bluff, Arkansas. While it is a civilian operation, its Commander is an Army Colonel. Reporting to the Commander are the heads of the eleven major divisions.

3. The General Schedule ("GS") pay plan covers all civilian professional, technical and clerical employees. It is divided into pay levels, identified by numbers; the higher the level, the higher the base pay. The levels range from GS-2 to GS-15. Each pay level is further divided into steps; the higher the step, the higher the pay. In most grades there are ten steps, each step having a progressively higher rate of pay.

Grade increases are generally the result of competitive promotions, while step increases are generally a function of longevity of service. In GS, step increases are normally given annually up to step 4, every two years for steps 5 through 7, and every three years for steps 8 through 10.

4. With a few exceptions it is the policy at the Arsenal to promote from within. Promotions are required to be competitive through the Merit Program, but there are exceptions. For example, in the Upward Mobility Program, the promotion or transfer into the Upward Mobility entry position is on a competitive basis, but the intervening grade level promotions aren't.

5. When a vacancy occurs, the supervisor over that position submits a request to the Civilian Personnel Officer, (CPO) one of the eleven major divisions, Mr. Eugene L. Schatz. The requisition then goes to a position classifier, under Mr. Schatz's supervision, as are all positions in the Office of Civilian Personnel. The position classifier then verifies that the duties and job title correspond.

The requisition then goes to a staffing specialist in the Office of Civilian Personnel who determines whether the position should be filled at its current level or re-engineered to a different level, e.g. into an upward mobility position. All actions are under the supervision of Mr. Schatz.

Then the position is announced. When applications are received, the CPO determines if each candidate meets the minimum qualifications. An Office of Personnel Management manual, X-118, is the guidebook for screening purposes. It contains general qualification standards throughout the federal system and the personnel officer must interpret the qualifications as they relate to specific jobs at the Arsenal. If a candidate does not meet the minimum qualifications, in the opinion of the personnel officer, the individual is rated "unqualified" and no further action is taken on that application. It was at this step that the plaintiff was declared ineligible.

6. In January, 1979, James Dean held the position of Housing Project Manager at the Arsenal. It was classified as GS-7 and was under the supervision of the Directorate of Supply and Services, headed by Daniel J. Rodgers. In 1975, Mr. Rodgers and Mr. Dean attempted to have the Housing Project Manager position reclassified as GS-9, but this effort was opposed by the CPO.

7. The Housing Project Manager's responsibilities were to oversee centralized housing operations assigning space in 44 government controlled family housing units (although, in fact, the Commander made the assignments), to make referrals for off post housing, and to operate post billeting for bachelor officers, enlisted personnel and transients. In addition, the Housing Project Manager was responsible for referring personnel to appropriate community services, such as social services, transportation, financial, legal, medical and dental services. These functions were called "Community Affairs", and while Mr. Dean was in the position and until May, 1981, these functions were handled by a sergeant whose specialty was helicopter mechanics. There were no helicopters at the Arsenal.

8. In January, 1979, Mr. Dean applied for and received promotion to Equipment Manager, a GS-9 level position. Although the Housing Project Manager's position

was now vacant, there was *no discussion* by the CPO or the Equal Employment Opportunity Officer (EEOO) with Mr. Rodgers about classifying the position as an Upward Mobility position, GS–5 upward to GS–7. The CPO and EEOO were under a duty imposed by the Equal Employment Opportunity Plan of Action (EEOPA) to assess the feasibility of restructuring the vacant position to a lower entry level for upward mobility purposes.

9. The Base Commander in the EEOPA published in October, 1978 said: "The average grade for minority and women employees is nearly two grades below the average grade for the Arsenal. This inequality can only be rectified by strong, affirmative action to select and promote minorities and women for higher level positions. We are planning additional activities in the Federal Women's Program and to create more upward mobility positions." This statement was printed and distributed a few months prior to the vacancy in question. Indeed, the government conceded in its post-trial brief that the Arsenal had experienced difficulty in recruiting women for "high level" positions at the Arsenal. The need to at least consider upward mobility as a means of giving women an opportunity at the higher level jobs was apparent.

10. Mrs. Ann Rogers, in February, 1979, was employed at the Arsenal as a stenographer classified as a GS–4, step 5. She had been employed there since 1971 as a clerk-stenographer, GS–3. In 1974, she attained the level of GS–4, as a stenographer. Between 1971 and February, 1979, she had applied for numerous promotions, attempting to obtain a higher classification and grade level out of the clerk-stenographer field. There was credible testimony that indicated no male at the Arsenal had ever remained at that level for that long.

11. Mrs. Rogers has a BS/BA in real estate and insurance from the University of Arkansas where she was in Chi Theta honorary Business fraternity. She worked part-time as office manager, vice president and treasurer of a Pine Bluff real estate and insurance business from 1965 to 1971,

when she went to work at the Arsenal. The Court finds that her training and experience easily qualified her for the vacancy.

12. Only the plaintiff and two other women applied for the position. Each was ruled ineligible or unqualified by the CPO. Mrs. Rogers was ruled ineligible because of failure to meet "Time in Grade" requirements (5 CFR 300.601, *et seq.*) because she was a GS–4 and to have been eligible she would have had to have been a GS–5 for at least one year. The other two females lacked specialized experience. Although it was acknowledged by Dan Rodgers (Housing Project Manager's supervisor), Thomas Shook (plaintiff's supervisor) and Schatz that Mrs. Rogers had been underutilized, no attempt was made to take advantage of an exception to the "Time in Grade" requirements, i.e., to prevent undue hardship or inequity (5 CFR 200.603(4)).

13. These three females filed their applications between February 7, 1979, the date of the announcement, and February 13, 1979. On February 20, 1979, the Housing Project Manager job description was restructured to GS–9 level, with the addition of community affairs functions. They had previously been in that office handled by the helicopter mechanic who performed them until 1981.

The Court finds no valid nondiscriminatory reason for the restructuring of this position at that time.

14. The CPO maintained an "under utilized card index" which was a listing of those employees at the Arsenal who had skills or experience which exceed their present assignments. Plaintiff's name was in this index. Although the EEOPA required a review of the index upon the occurrence of a vacancy, it was ignored by the CPO.

15. When the Housing Project Manager's position was restructured to a GS–9 Mr. Dean was asked if he would take the job again. He declined.

16. On March 25, 1979, Ms. Tess Hill, an Arsenal employee, was appointed

"Housing Project Assistant, GS–7, Temporary Not to Exceed One Year".

17. In April, 1979, the position was advertised in *Federal Times,* a newsletter that goes primarily to federal employees, at the GS–9 level. It was not announced at the Arsenal.

18. Mr. Herbert Caviness was selected for the position, reporting for duty in September, 1979. Mr. Caviness vacated the position and it was announced again in April, 1980 as a GS–5, upward mobility to GS–9.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction of the subject matter and the parties to this action pursuant to 42 U.S.C. § 2000e *et seq.*

2. The plaintiff in a disparate treatment case must establish a prima facie case of discrimination by showing that she belonged to a protected group; that she applied and was qualified for the vacancy; that despite her qualifications she was rejected; and that subsequent to the rejection the employer continued to seek applicants with the same or similar qualifications. *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The Court finds that the plaintiff met her burden. She is a female with a college degree and experience in real estate. She was rejected and a male was eventually selected for the position. Mr. Daniel Rodgers, the selecting official, who would supervise the new Housing Manager testified that she was qualified and had been under-utilized.

3. Did the defendant meet its burden to articulate some legitimate, nondiscriminatory reason for rejecting her for promotion? The government cites the "Time in Grade" requirements of 5 CFR 300.601, *et seq.* and "specialized" experience required in the OPM X–118 Manual and the job description. Although there was a dispute at trial as to the extent that her experience was reflected in her personnel file, the Court finds that she met the specialized experience requirements. However, she did not meet the "Time in Grade" requirements without benefit of a waiver.

4. Did the plaintiff meet her burden of demonstrating that the articulated reason was a pretext for discrimination and that the defendant intentionally discriminated against her because of her sex? The Court concludes that she did. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

5. The Commanding Officer's EEOPA statement; the government's admission that many women, including the plaintiff, at the Arsenal were "under-utilized"; the testimony showing the plaintiff's abilities and experience; and the failure to consider "upward mobility" for this vacancy reflect an official policy designed to give women a chance to advance, but that policy was not followed in the plaintiff's case.

6. When the Housing Project Manager position was restructured to a GS–9 with the addition of duties that were already being performed in that office, the attempt was made to get Mr. Dean to come back into the position. This was done after the plaintiff and the other women had been rejected.

7. Mr. Shatz testified that it was his duty to get women and minorities into higher positions and that the plaintiff was in fact "under-utilized". When asked why he didn't consider a waiver of the "Time in Grade" requirements (which would have been consistent with the stated policy on women and minorities) he said that the plaintiff had not requested such a waiver. The Court finds that instead of giving the plaintiff a fair chance at the position, Mr. Shatz did all that he could to deprive her of that chance because of her sex.

8. The above circumstances lead to the inescapable conclusion that the defendant intentionally discriminated against Mrs. Rogers.

IT IS CONSIDERED, ORDERED AND ADJUDGED:

That the plaintiff is entitled to back pay, present pay at grade GS–9 step 4, costs and

attorneys' fees. The parties are directed to confer in an effort to agree upon the specific sums to which she is entitled. The parties shall report to the Court within fourteen days of this date their agreement or their inability to agree. The Court will then enter appropriate judgment.

The defendant is enjoined from further discrimination against plaintiff because of her sex.