Lillian W. REAVES, Plaintiff,

v.

John O. MARSH, Jr., In His Official Capacity As The Secretary of the Department of the Army of the United States, Defendant.

No. PB–C–82–419.

United States District Court,
E.D. Arkansas,
Pine Bluff Division.

April 9, 1987.

John T. Lavey, Lavey, Harmon & Burnett, Little Rock, for plaintiff.

George Proctor, U.S. Atty., Little Rock by Katherine McGovern, Asst. U.S. Atty., Vincent E. Reilly, Civilian Personnel Litigation Dept. of the Army, Washington, D.C., for defendant.

## MEMORANDUM OPINION AND ORDER

GEORGE HOWARD, JR., District Judge.

The plaintiff, Lillian W. Reaves, (Reaves) a white female, instituted this civil rights action on December 20, 1982, against the Secretary of The Department of the Army of The United States alleging that as an employee of The Department of the Army, Pine Bluff Arsenal, Pine Bluff, Arkansas (Arsenal), she was paid less wages for performing "work assignments substantially similar to work assignments performed by males and denied promotions or job reclassification to higher levels because of her sex."

The jurisdictional grounds asserted are: 28 U.S.C. § 1343(3) and (4); 42 U.S.C. §§ 2000e–5(f), (g); and 28 U.S.C. §§ 2201 and 2202.

The following relief is requested:

1. Back pay from December 9, 1980, to January 23, 1983—the difference in pay that she actually received as a GS–9 archi-

tectual technician and that pay she would have received had her job assignment been reclassified as GS–10 during this time frame.

2. Retroactive promotion to a GS–11 commencing January 23, 1983, to February 5, 1984. Reaves argues that she should have been promoted to a GS–11 rather than a GS–10 Engineering Technician on January 23, 1983, but didn't get the GS–11 until February 5, 1984.

The central question before the Court is whether Reaves, who alleges that she was doing the same work as men with higher grades, was discriminatorily denied a reclassification of her job assignment—Architectual Engineering Technician GS–9—to GS–10 because of sex.

### I.

#### BACKGROUND INFORMATION

The Equal Employment Opportunity Plan of Action for the fiscal year 1979 for the Arsenal states the following in the forward:

During the past years Pine Bluff Arsenal has experienced both real and significant progress toward full equal employment opportunity for all. However, an analysis of our accomplishment, or lack thereof, reveals that there is much to be accomplished before equal employment opportunity for all is a day-by-day way of life for each member of the "Arsenal family." *The average grade for minority and women employees is nearly two grades below the average grade for the Arsenal. This inequality can only be rectified by strong, affirmative action to select and promote minorities and women for higher level positions.* The number of women, except in administrative positions, in the workforce is still below the percentage of working women in our local area. This can be overcome by eliminating the stereotyped images of which type of work a woman should, or should not, do. Likewise, some of our majority employees have not had an equal opportunity

for training, promotions and job enhancement. (Emphasis added)

The Arsenal's Equal Opportunity Plan for fiscal year 1980 provides, in relevant part:

*Chart No. 5* shows the index of representation of the categories of employees in technical occupations at [the Arsenal]. [The Arsenal] has personnel at six grade levels in these occupations. White men are overrepresented in the three highest grades, and underrepresented at the lower grade levels; with one exception (black males at grade GS–5), minority males are underrepresented at all grade levels. White women are overrepresented at the three lowest grade levels and underrepresented at the higher grade levels; with two exceptions (black women at grade GS–3 and American Indian women at grade GS–7) minority women are underrepresented at all grade levels.

In the case of *Rogers v. Marsh*, 573 F.Supp. 635 (E.D.Ark.1983), Judge Elsijane T. Roy made the following findings regarding the propensities of the Director, Eugene Schatz, white male, of the Civilian Personnel Office of the Arsenal regarding the under-utilization of women and minorities in higher positions:

"5. When a vacancy occurs, the supervisor over that position submits a request to the Civilian Personnel Officer, (CPO) one of the eleven major divisions, Mr. Eugene L. Schatz. The requisition then goes to a position classifier, under Mr. Schatz's supervision, as are all positions in the Office of Civilian Personnel. The position classifier then verifies that the duties and job titles correspond.

The requisition then goes to a staffing specialist in the Office of Civilian Personnel who determines whether the position should be filled at its current level or re-engineered to a different level, e.g. into an upward mobility position. All actions are under the supervision of Mr. Schatz."

. . . . .

"7. Mr. Schatz testified that it was his duty to get women and minorities into higher positions and that the plaintiff was in fact 'under-utilized.' When asked why he didn't consider a waiver of the 'Time-in-Grade' requirements (which would have been consistent with the stated policy on women and minorities) he said that the plaintiff had not requested such a waiver. The Court finds that instead of giving the plaintiff a fair chance at the position, Mr. Schatz did all that he could to deprive her of that chance because of her sex." [1]

"8. The above circumstances lead to the inescapable conclusion that the defendant intentionally discriminated against Mrs. Rogers."

Data, acquired during the Army's investigation of complaints registered by females during the year 1981, including Reaves' complaint, disclosed that females constituted 37.4% per cent of the workforce in the Metropolitan Pine Bluff, Arkansas area and 33% per cent of Arsenal's workforce, but women were underrepresented in grades GS–9 and above at the Arsenal; and "[a]ll but two of the 58 Classifications, (GS) positions, at grades GS–12 and above are occupied by men, and white males employees occupy all of the 14 positions above GS–12 level." [2]

---

**1.** Colonel Stanley Olson, Commander of the Arsenal, testified in *Rogers v. Marsh*, Case No. PB–C–82–106, as follows:

"... Any time you have a new commander or a new senior person come in, they try and feel you out as to what your policies are going to be, and so on. And I received comments, and I can't specify what level, who they were, but you know, 'you ought to take a look at the CPO officer because the Civilian Personnel Officer, you know, Mr. Schatz, appears to be anti-female or anti-black'."

**2.** The General Schedule ("GS") pay plan covers all civilian professional, technical and clerical employees. It is divided into pay levels, identified by numbers; the higher the level, the higher the base pay. The levels range from GS–2 to GS–15. Each pay level is further divided into steps; the higher the step, the higher the pay. In most grades there are ten steps, each step having a progressively higher rate of pay.

Grade increases are generally the result of competitive promotions, while step increases are generally dependent on length of service. In GS, step increases are normally given annually up to step 4, every two years for steps 5 through 7, and every three years for steps 8 through 10. See also: *Rogers v. Marsh, supra.*

The race and gender of the workforce in the Directorate of Facilities Engineering, area in which Reaves was employed, as of August 24, 1984, is as follows:

| | | |
|---|---|---|
| CLERICAL POSITIONS | No males of either race | 0 |
| | 9 white females | 69.3 |
| | 4 black females | 30.7 |
| OTHER GS/GM POSITIONS | 52 white males | 73.2% |
| | 9 white females | 12.7 |
| | 10 black males | 14.1 |
| | 1 black female | 0 (sic) |
| WG POSITIONS | 152 white males | 89.9% |
| | 3 white females | 1.8 |
| | 13 black males | 7.7 |
| | 1 black female | 0.6 |
| ALL POSITIONS | 204 white males | 80.6% |
| | 21 white females | 8.3 |
| | 23 black males | 9.1 |
| | 5 black females | 2.0 |

## II.

## RELEVANT FACTS

Reaves was employed as a clerk-stenographer in Engineering and Maintenance Division at the Arsenal in September, 1953, and worked there until sometime in 1960 when she resigned to accept employment with the Veterans Administration Hospital in Little Rock, Arkansas. Reaves returned to the Arsenal in September, 1962 as a clerical employee and held this position until August 8, 1971, and had achieved a GS-6 rating. At that time, Reaves applied for and received permission to fill a vacancy, Architectural Engineering Technician, but was required to relinquish her GS-6 rating and assume a GS-5 rating. Reaves was designated as the "best qualified" on the applicant list. Reaves was the first female to be employed in engineering and the first woman to fill an engineering technician position.[3] On August 20, 1972, Reaves was promoted to a GS-6 Architectural Technician and was further elevated to GS-7 on

**3.** Linda Beasley, a female, was hired by the Arsenal as an engineering technician in the mid 1970's. Beasley worked in the area of product assurance and not in the engineering universe.

**4.** On November 4, 1979, Reaves was selected as manager of the Federal Women's Program at the Arsenal. She worked closely with the EEO officer, but was directly responsible to the commanding officer. Reaves resigned from this position on November 1, 1981.

**5.** Some of the males who have been beneficiaries of double promotions in the Engineering Division are: Donald E. Carpenter, Mechanical

June 9, 1974, to GS-8 on June 20, 1975, and to GS-9 on August 1, 1976, which she held until January 23, 1983.[4]

John H. Dozier, Jr. Chief of Engineering, Plans and Services Division, GS-13, and Reaves' level Supervisor, proposed, at the end of Reaves' first year as an Architectural Engineering Technician and because of her "high level of work", that Reaves be afforded the "normal engineering progression" promotion of two grades at a time instead of one grade interval. But management, including the personnel office, insisted that Reaves be promoted one grade at a time. Dozier, however, argued that Reaves was qualified to do the work and was actually doing the same work that males were performing who had been promoted, according to a practice in that Directorate, two grades at a time. Reaves was the first engineering technician for whom Dozier could not obtain a double promotion in the Engineering Division.[5]

Sometime during April, 1979, a position for a GS-10 mechanical engineering technician was announced. Reaves applied to fill this vacancy and her name appeared on the qualified list, but the position was assigned to Wayne Hogan, a white male.

On May 13, 1980, Reaves sought to fill a vacancy for Civil Engineering Technician, GS-10. She and three males, Henry L. Gilbert, GS-9, Henry C. Harrison, GS-9 and Billy R. Sullivan, GS-9, were designated as the "best qualified candidates", but Sullivan received the promotion.

Thomas L. Hogue, a job evaluation expert of Headquarters, U.S. Army Armament Material Readiness Command, made the following findings regarding the work

Engineering Technician, was promoted from a GS-7 to GS-9 on December 19, 1983; John W. Simmons, Jr., Engineering Technician, was promoted from a GS-7 to a GS-9 Mechanical Engineering Technician on March 20, 1984; Wayne Hogan, Engineering Draftsman, was promoted from a GS-5 to a GS-7 Engineering Technician on August 4, 1963; Perry L. Jacks from a GS-9 Engineering Technician to a GS-11 Engineering Technician on April 18, 1971; Henri Pate from a GS-7 Engineering Draftsman to a GS-9 Engineering Technician Draftsman on May 2, 1971.

assignments performed by Reaves and the two males, William Sullivan, Civil Engineering Technician, GS–10 and Wayne Hogan, Mechinical Engineering Technician, G–10, whom Reaves contends received greater pay for similar work:

2. Ms. Reaves is a Pine Bluff Arsenal employee assigned to the Facilities Engineering Directorate, Engineering Plans and Services Division, Engineering and Services Branch. The workload responsibilities within the Engineering and Services Branch are assigned to three teams:

Buildings Team

Plants and Energy Team

Support Engineering Team

Ms. Reaves is assigned to the Support Engineering Team. The Support Engineering Team has assigned responsibility for:

"Civil Engineering support to other teams and for entire Arsenal, Igloos, Housing Office support, troop area buildings and structures, tenants, roads and surfaced areas, railroads, grounds, drainage and erosion, 13 KV electric system, electric KW control, lightening protection systems annual survey, Telephone System Manager, excess facilities disposal, natural gas, water, industrial and sanitary sewage systems up to 5″ from buildings, utility metering of assigned buildings, Central Waste Treatment Facility support, main line gas, water and electrical metering, security systems trouble shooting, street and lighting systems."

The Support Engineering Team at the present time is composed of six members:

General Engineer, GS–801–12 (Team Leader)

Electrical Engineer, GS–850–12

Civil Engineer, GS–810–11

Mechanical Engineer, GS–830–11

Civil Engineering Tecnhician, GS–802–10

Architecture Technician, GS–802–09

Projects assigned to the Support Engineering Team are distributed by the team leader to team members based upon the primary skill required to complete the project. For example, a project primarily involved in the remodeling of the interior of a troop area building would be assigned to Ms.

Reaves. She in turn would draw from other team members if the project involved electrical, mechanical or civil engineering support. She would support the Contracting Officer's Representative if the project went to a contractor to do the work and would deal with the Architectural Engineer if the architectural plans went to contract. As the project manager of any project she is responsible for maintaining a reasonable time table, assuring that others who have input are aware of the schedule and their input is timely. She keeps the team leader informed and prepares a completion report evaluating the work and response of contractors and others involved with the project.

. . . . .

Ms. Reaves also provides Architectural support to team members whose assigned projects involve work in her expertise.... She works with the same degree of independence and has the same available technical and professional assistance as when working on her own assigned projects.

... According to both Ms. Reaves' Team Leader, Mr. Faust, and the Division Chief, Mr. Dozier, the work assigned to Ms. Reaves is not screened to give her less complex work.

The current evaluation for Ms. Reaves' position does not reflect the complexity of assignments depicted in the job description....

. . .

"5. After reviewing the three positions [Civil Engineering Technician GS–10, Mechanical Engineering Technician GS–10 and Architectural Technician GS–9], I discussed the assignment of duties to the three people with their common supervisor Mr. John Dozier, Chief, Engineering Plans and Servicing Division. Mr. Dozier assured me that the assignments given to the three people were of equal complexity, and that the assignments given to Ms. Reaves were not screened to eliminate the more complex.

"6. In conclusion I can report that I did not find a significant difference in the complexity of work assigned to Ms. Reaves,

Mr. Hogan, and Mr. Sullivan. Neither Mr. Faust, the team leader for Ms. Reaves and Mr. Sullivan, nor Mr. Dozier, the common supervisor over Ms. Reaves, Mr. Sullivan, and Mr. Hogan, could provide any additional information which would indicate any difference in the complexity of work or the amount of supervision or technical assistance provided to the three people. Therefore, I can only conclude that the three people are working at the same grade level, GS–9."

## III.

## PENDING MOTIONS

Before resolving the substantive issues tendered in this vigorously and hotly contested proceeding, the Court must consider two motions renewed by defendant in his post trial brief.

■ First, defendant moves to strike the general statements taken from Arsenal's Affirmative Action Plan regarding the underrepresentation of females in the three highest technical occupation grades and figures offered to demonstrate an unbalanced workforce at the Arsenal. Defendant argues that these statistics are "meaningless" and should be accorded little weight because of plaintiff's failure to offer statistical evidence demonstrating the composition of the job applicant pool or applicant flow log. Given the fact that it is clear, from the evidence, that the Arsenal has a policy of promoting from within, the relevant labor pool, in resolving the issue here would constitute the General Schedules classifications. In June and October, 1981, females constituted approximately 33% per cent of the total employees employed in the GS classifications. Accordingly, defendant's motion to strike is without merit and is denied. *See, Paxton v. Union National Bank*, 688 F.2d 552 (8th Cir.1982).

■ Defendant also asserts that the only issue to be resolved is Reaves' wage disparity claim (job reclassification); and that Reaves' claim of discriminatory failure to

promote her to GS–10 architectural technician position is not before the Court. Defendant argues that Reaves failed to exhaust her administrative remedies regarding her failure to be promoted and thus this alleged claim is barred.

Regarding the promotion claim, Reaves alleged the following in both her initial and amended complaint:

5(b) Commencing on or about December 9, 1980, and continuing to date, defendant has discriminatorily failed to promote and/or discriminatorily failed to reclassify Lillian W. Reaves to the jobs of GS–10 civil engineering technician and/or GS–10 mechanical engineering technician jobs and/or to GS–10 architectural technician because of her sex.[6]

In her administrative complaint filed with EEOC, Reaves alleged "I have been discriminated against because of my sex, I am doing the same work as men with higher grades". Regarding the specific corrective action that Reaves wanted to be taken, Reaves stated, "[p]romotion to GS–10." The Court is persuaded that Reaves' claim that Arsenal discriminatorily failed to promote her to GS–10 either as a civil engineering technician, mechanical engineering technician or architectural technician is within the parameters of her administrative complaint. Moreover, not only did defendant fail to object to Reaves' offer of evidence before the EEOC hearing officer and this Court regarding defendant's failure to promote her to a higher grade level, but defendant offered evidence to disprove Reaves' claim of discriminatory promotion. Clearly, the administrative record was more than sufficient to place defendant on notice that failure to promote because of Reaves' sex was an issue. *See, Jackson v. Seaboard Coast Line Railroad*, 678 F.2d 992, 28 FEP cases 443 (11th Cir.1982); *President v. Vance*, 627 F.2d 353, 22 FEP cases 1017 (D.C.Cir.1980).

## IV.

## DISCUSSION

At the outset, it is clear to the Court that the thrust of Reaves' action is one for

---

**6.** Defendant in his answer asserted affirmatively, as a defense, "Plaintiff has failed to exhaust her administrative remedies with regard to paragraph 5(b) of her complaint."

equal pay for equal work. In other words, Reaves claims that she received less wages than male employees for similar work assignments because of intentional sex discrimination. Also, she claims that she was not promoted because of her sex.[7]

Title 42 U.S.C. § 2000e–2(a)(1) provides: (a) It shall be an unlawful employment practice for an employer—
(1) ... to discriminate against any individual with respect to his compensation, ... because of such individual's ... sex....

Title 42 U.S.C. § 2000e–2(h) states:

(h) Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, ... bona fide seniority or merit system, or a system which measures earnings by quantity or quality of production or to employees who work in different locations, provided that such differences are not the result of an intention to discriminate because of ... sex, nor shall it be an unlawful employment practice for an employer to give and to act upon the results of any professionally developed ability test provided that such test, its administration or action upon the results is not designed, intended or used to discriminate because of ... It shall not be an unlawful employment practice under this subchapter for any employer to differentiate upon the basis of sex in determining the amount of the wages or compensation paid or to be paid to employees of such employer if such differentiation is authorized by the provisions of section 206(d) of Title 29.[8]

After carefully considering the voluminous record in this case, the Court is persuaded that Reaves has established a *prima facie* case, by a preponderance of the evidence, that defendant intentionally paid her less compensation, from December 9, 1980, to January 23, 1983, than that paid two males, William Sullivan and Wayne Hogan, for work at least substantially equal to the work performed by Sullivan and Hogan because of Reaves' sex.[9]

While the duties and responsibilities of Reaves, Sullivan and Hogan may not have been identical in every form and fashion, it is clear that their respective work assignments involved substantially, at least, the same level of responsibility, complexity, judgment, knowledge and training although each incumbent performed his/her job assignment seemingly in a different discipline. This finding is not only supported by the testimony of Dozier, Reaves' level supervisor, but the findings of Thomas L. Hogue, a job evaluation expert of Headquarters, United States Army Armament Material Readiness Command, who found that the GS–10 positions held by Sullivan and Hogan should be classified as GS–9s rather than GS–10s for there was no significant difference in the complexity of the work assignments at their level and Reaves' GS–9 slot. Moreover, Donald Faust, Civil Engineer GS–12 and leader of the Support Engineering Team, testified that Reaves' position should be upgraded to a GS–10 because there was no material difference in the responsibilities and complexities of the job assignments performed by Reaves and Sullivan. Given the fact that Dozier was the level supervisor to

---

**7.** The Court holds that the central issue presented, whether characterized either as a failure to promote from or a failure to reclassify Reaves' GS–9 position to a GS–10, is whether Reaves performed, at least, substantially the same work assignment as that performed by Sullivan and Hogan, but was paid less because of her sex.

**8.** 29 U.S.C. § 206(d) sets forth four affirmative defenses to a claim of disparate compensation based on sex. A defendant has the burden of proving the wage differential is the result of: (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or

quality of production; and (iv) a differential based on any other factor other than sex.

**9.** Equal work is defined as "jobs the performance of which require equal skill; effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d).

The Court must take into consideration the nature of the duties actually required and performed in determining whether the work is equal and not the official job description or title. *See, Katz v. School District of Clayton, Missouri,* 557 F.2d 153 (8th Cir.1977).

Reaves, Sullivan and Hogan, and Hogue was, seemingly, a disinterested outsider, although an officer in the United States Army, the Court credits their testimony regarding the substantial similarity or equality of the work assignments of Reaves, Sullivan and Hogan.

■ Having established a *prima facie* case of sex discrimination in compensation paid to Reaves, the burden shifted to defendant to demonstrate that the disparity in pay was based on some factor other than Reaves' sex. *DiSalvo v. Chamber of Commerce of Greater Kansas City*, 568 F.2d 593 (8th Cir.1978). The Court holds that defendant has failed to establish that the disparity was based on some factor other than sex. Assuming, however, that defendant demonstrated a basis other than sex for the differential in pay, the Court holds that Reaves has shown by a preponderance of the evidence that the asserted reason is a pretext to conceal intentional sex discrimination. Moreover, the Court is further persuaded absent the *animus* to discriminate based on sex, Reaves would have been elevated to a GS–10 as initially recommended by Dozier, Reaves' level supervisor.

Defendant argues that the difference in pay for the respective grades, namely GS–9 versus the two GS–10 slots, is justified by a classification process that was not only neutral, but objectively applied. This Court is convinced after scrutinizing the record, that defendant's application of its classification process in Reaves' situation was something less than objective and straightforward.

### A.

#### FIRST CLASSIFICATION AUDIT MADE BY PEGGY STRANGE

The initial classification audit of Reaves' GS–9 position was by Peggy Strange of the Civilian Personnel Office which is headed by Eugene L. Schatz who had the reputation of being "anti-female and anti-black."

10. Thomas L. Hogue, the outside job evaluation expert, found that Reaves' "current evaluation" for the GS–9 position did not reflect the com-

Strange concluded that Reaves' duties and responsibilities were consistent with the GS–9 slot and not the GS–10 rating.

Strange testified that she was familiar with the three positions involved in this case inasmuch as she performed the classification survey for the mechanical technician GS–10 and the civil engineering technician GS–10 when these positions were upgraded in 1979 and was familiar with the duties and responsibilities of the architectural engineering technician GS–9 having had more than ten years experience in classification. The difficulty the Court has in affording weight to Ms. Strange's audit lies in the fact that, in addition to comparing Reaves' purported assigned duties and responsibilities [10] with classification standards of engineering technicians in the "Classification Handbook" for the GS–802 series, she used "her own judgment and experience" in classifying the jobs. Thus, Ms. Strange applied certain subjective factors or standards in conducting the initial classification audit.

Jerry Cobb, EEO Counselor, in his Report, following an interview with Peggy Strange regarding the initial desk audit of Reaves' GS–9 duties stated, in commenting on the quality of Strange's audit: "... she [Peggy Strange] had not done an in depth desk audit that the report was only a draft...."

Although Strange's audit was deficient in some respects, it, nevertheless, in one respect supported Reaves' claim that her duties were equal to Sullivan's and Hogan's when Strange asserted that the responsibility associated with being a project leader were duties that all individuals on the team possessed whether they were graded at a GS–9 or GS–10.

### B.

#### SECOND CLASSIFICATION AUDIT

Defendant argues that following the filing of Reaves' administrative complaint, Colonel Olson directed a classification audit

plexity of assignments depicted in the job description.

of the three positions in dispute.[11] This second audit was performed by the Pay and Management of the Civilian Personnel office, which is also under the direct supervision of Schatz. Strange and Ray Dodson performed this audit and resulted in no change in the classification of the three positions. Defendant places substantial reliance on this conclusion in arguing that Reaves' position is properly classified as a GS-9 instead of GS-10. However, the Court is not persuaded that this second audit is free of subjectivity and is the product of an analysis based strictly on an objective standard. For example, Ray Dodson testified as follows while under cross-examination by Mr. Lavey, Reaves' attorney, during the administrative hearing:

Q. Okay. Now, regarding CX-6, which is the job description evaluation statement of the Mechanical Engineering Technician, again, who drafted that evaluation statement; do you know?

A. Peggy Strange.

Q. She works under your supervision?

A. Yes.

Q. And regarding the evaluation statement, would you say that's fairly accurate?

A. Yes, I would say so.

Q. Okay. Now as I understand it, regarding the Mechanical Engineering and the Civil Engineering Technician job, you stated in substance that you applied the standards in AX-10, the GS-09 standards and the GS-11 standards.

A. Right.

Q. And you also said that—if I understand, you made a judgment that, regarding these technicians, that when you applied the standards to them—to those jobs that those technician jobs exceeded the 9 but didn't quite make the 11; is that correct?

A. Yes, that is correct.

Q. And is that based on the judgment you exercised?

A. It's based on a judgment—based on the contents of the job sheet.

Q. But its a judgment that you make? There is nothing in writing on that?

A. I graded the jobs, if that's what you are asking.

Q. Right. But it's a subjective judgment you are making?

A. No, it's not a subjective adjustment—judgment. It's review of the standards and comparing against the job description.

Q. Right. But you are saying it doesn't meet the 11, it doesn't meet the 9 and there is no 10 standard; is that correct? There is no GS-10 standard?

A. There is no 10 standard.

Q. Right.

A. But you are permitted to put the grade in 10.

Q. Right. But I am saying you make—you personally make that judgmental decision?

A. Right.

Q. Right?

A. That it exceeds a 9 and doesn't come up to the 11.

Q. Okay. And regarding Ms. Reaves, did you make the decision that it doesn't meet the 11 or it doesn't get quite beyond the 9?

A. I made the decision that it does not exceed the 9 and it was not a particularly strong 9.

Q. Did you also say that it didn't quite get up to the 11?

A. No, I didn't say that at all.

Q. You didn't huh? Okay. Directing your attention to page seven of your affidavit.

\* \* \* \* \* \*

Q. I quote on page seven, "The type of work listed at the grade 11 level, in our opinion, is just above what she's doing. We think it's more appropriate at the grade 9 level." So you are saying—

---

**11.** Defendant asserts that this second classification was done pursuant to an alleged agreement between Col. Olson and Reaves to settle Reaves' complaint of sex discrimination. Reaves vigorously denies any such agreement. The Court hastens to stress whether there was an agreement to settle is not an issue in this proceeding.

A. I made the statement and it's an accurate statement. You are taking it out of context. I am not saying she is just barely below a grade 11.

Q. You mean—the affidavit is going to speak for itself and I am not trying to take it out of context.

A. It's just above what she's doing. It's above what she's doing, not just barely above what she's doing.

Q. But again, did you apply the 11 and 9 standards to the—

A. I applied the entire standard for all three jobs.

Q. And did you make this judgmental value that it's more properly at the 9?

A. Yes, I did.

Q. Okay.

Finally, one difficulty confronting the Court after considering Dodson's testimony to the effect that there "is no [GS]10 standard", is reconciling the testimony of Peggy Strange to the effect that she consulted the "Classification Handbook" in making the initial audit when she concluded that Reaves' duties are not consistent with the GS–10 standards.

### C.

### THE THIRD CLASSIFICATION AUDIT

As previously noted, Thomas L. Hogue, a job evaluation expert, conducted an audit of the three positions in question in January, 1982. This audit was also conducted at the request of Colonel Olson. Hogue found that the jobs of Reaves, Sullivan and Hogan were all GS–9 jobs. Although Colonel Olson had stated, prior to Hogue's audit and recommendations, that the Hogue audit would be dispositive of the issue; and that he would abide by Hogue's recommendation, Colonel Olson did not take any steps to reduce Sullivan's and Hogan's positions to GS–9.

Given the fact that Hogue was an outsider and all concerned, including Strange, conceded that Hogue applied valid job analysis standards to the three positions, this Court is persuaded that Hogue's audit should be afforded substantial weight and credit. Of course, it is plain that defendant

as well as Strange disagree with Hogue's findings and contend that Hogue did not spend enough time or go into sufficient depth in making his evaluation. But it must be remembered that Hogue's prime duties consist of evaluating jobs, conducting reviews of classifications and making spot audits at army facilities for the United States Army Headquarters. Hogue also possessed the authority to revoke classification authority if not in keeping within acceptable range. This Court is persuaded that Hogue's audit was not only independent in scope, but was objective and administered in good faith.

Finally, in seeking to demonstrate a fundamental difference between the work assignments of Reaves and her two associates, defendant argues that the jobs of Sullivan and Hogan required them to act "as leaders" meaning that they would "instruct new people in the area". While this argument is in direct conflict with Peggy Strange's assertion that the responsibility associated with being a project leader were duties that all individuals on the team possessed whether a GS–9 or GS–10, Donna W. Pee, Equal Employment Opportunity officer for the Arsenal, in her addendum to the EEO's report on Reaves' complaint, found just to the contrary to both Strange and defendant when she observed:

Mr. Dozier stated that Ms. Reaves is working at the GS–10 level. Comparing job descriptions, GS–9 and GS–10, shows main difference to be GS–10 acts as leader meaning that the individual would instruct new people in the area. *Since this has not happened with the GS–10s (at their own admission) the GS–10's and Ms. Reaves are doing the same work.* (Emphasis supplied).

### V.

### GS–11 PROMOTION CLAIM

Finally Reaves argues that she was discriminatorily denied a promotion to the GS–11 engineering technician job on January 23, 1983, because of sex. She contends that the GS–10 slot that she received on January 25, 1983, was initially posted as a

GS–11, but was later reduced to a GS–10. Thus, she argues, she should recover the difference in pay between the GS–10, which she received on January 23, 1983, and the GS–11 rating that she received on February 5, 1984.

 The Court holds that Reaves has failed to establish a *prima facie* case, by a preponderance of the evidence, that defendant intentionally refused or failed to promote her to a GS–11 because of her sex and, therefore, the Court dismisses this claim with prejudice. Assuming, however, that Reaves has established a *prima facie* case, the Court finds that defendant has established a legitimate nondiscriminatory reason, not based on sex, for its conduct and Reaves has failed to demonstrate that the asserted reason is merely pretextual.

It is clear from the record that Reaves did not file an administrative complaint regarding the alleged denial of promotion to GS–11. In addition, the Court is not persuaded that Reaves' EEOC complaint of June 1, 1981, may be construed to encompass this asserted claim. It is plain that the 1981 complaint dealt only with the "GS–10" position.

Moreover, the evidence demonstrates clearly that Reaves' work assignment was that of a GS–10 not GS–11 as of January 23, 1983.

## VI.

### REMEDY

Accordingly, Reaves is entitled to the following relief:

1. A retroactive GS–10 promotion from December 9, 1980, to January 23, 1983, with appropriate within grade step increases, applicable cost-of-living raises and other relevant fringe benefits, including back pay.[12]

2. Reasonable attorney fees and cost incurred. Mr. Lavey is afforded ten (10) days from the date of entry of this order to file the appropriate statement setting forth his schedule for the fee claimed.

---

12. Counsel are permitted ten (10) days from the file-date of this Memorandum Opinion and Order in which to stipulate to the amount of judgment to be entered. If a stipulation is not reached within this time frame, a hearing is scheduled for the reception of any additional testimony relative to the amount of recovery on the 29th day of April, 1987, at 9:30 a.m. o'clock in Courtroom 436, United States Post Office and Courthouse, Little Rock, Arkansas.