Loretta S. **PARKER**, Plaintiff,

v.

James **BURNLEY**, Secretary, United States Department of Transportation; T. Allan McArtor, Administrator, United States Federal Aviation Administration, Defendant.

No. 1:87–CV–692–RHH.

United States District Court, N.D. Georgia, Atlanta Division.

July 12, 1988.

---

Dana E. McDonald, Office of Dana E. McDonald, Atlanta, Ga., for plaintiff.

James Randolph Schulz, Office of U.S. Atty., Atlanta, Ga., for defendant.

James T. Langford, Jacobs & Langford, Atlanta, Ga., Alice Dorrier Bonner, for State Bar of Georgia, amicus.

## ORDER

ROBERT H. HALL, District Judge.

Plaintiff brings this action for damages, declaratory and injunctive relief pursuant to the Equal Pay Act of 1963, 29 U.S.C. § 206(d); Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–16; the Classification Act of 1949, 5 U.S.C. § 5101; and the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* Trial was conducted on February 18, 19, 22, 1988. The court makes the following Findings of Fact and Conclusions of Law:

### A. *Findings of Fact*

1. The Plaintiff, Loretta S. Parker, is and has been employed by the United States continuously since October 1, 1962. She has worked for the United States Department of Transportation ["DOT"] and its constituent agency, the Federal Aviation Administration ["FAA"] since July 2, 1967. Complaint, ¶¶ 1 and 5 (allegations admitted in Defendants' Answer).

2. From 1962 to 1976, the Plaintiff served in secretarial and clerical positions with the FAA. From 1976 to September 1979, she was assigned to nonclerical positions in Louisville, Kentucky, and Montgomery, Alabama. In September 1979, she was transferred to a GS–7 "Statistical Assistant" position in Atlanta. Plaintiff's Exhibit 10(a).

3. All positions she has held since 1979 have been in the Airway Facilities Division, the organizational unit containing the Maintenance Program Branch and one of its sections, the Field Program Section. The Section supervisor beginning in 1983 was Edward Wayne Watkins. He had been preceded by Anne K. McMillin. Transcript of 11/4/87 deposition of Anne K. McMillin [1] at 10–11, and Administrative Hearing Transcript [2] [hereinafter "AHT"], pages 191–193 (Testimony of Mr. Watkins).

4. Ms. McMillin selected the Plaintiff for the Statistical Assistant position as a part of an upward mobility program for women in the FAA. McMillin Dep. at 16. Attaining the position enabled the Plaintiff to enter into a professional career-ladder, thereby affording her the opportunity to achieve significantly higher-graded positions within the division. *Id.*

5. As part of the program, the Plaintiff was required to enroll in college. McMillin Dep. at 16. She did so, beginning in 1980, and she completed her professional degree program at the Georgia State University in March 1988. She has been an excellent student. Plaintiff's Exhibit 10(b).

6. In May 1982, upon her completion of eight college level mathematics courses, including three advanced statistics courses, Ms. McMillin promoted her to a GS–9 position. Plaintiff's Exhibit 10(a) and (b).

7. On May 15, 1983, she was promoted to a GS–11 Engineering Statistician posi-

---

**1.** Ms. McMillin has retired and now lives outside of the jurisdiction of this court. Her deposition was offered in lieu of live testimony.

**2.** The EEOC conducted a hearing on October 3 and 17, 1986, pursuant to 29 C.F.R. § 1613. Twelve witnesses testified and various exhibits were admitted. A transcript of the hearing was made and admitted at trial.

tion in the Field Program Section. Complaint ¶ 5 (admitted in Answer).

8. The Plaintiff has remained a GS–11. Plaintiff's Exhibit 16(a) and (b) (Response to Plaintiff's First Request for Admission 1 and 2).

9. The Plaintiff's job performance has been very highly rated, as indicated by Mr. Watkins' 1985 report:

I have worked with Loretta Parker for several years and have functioned as her supervisor since July 1983. During the time I have worked with Loretta, she has always performed in an excellent manner. She is dedicated to her job and has always tried to improve herself.

Plaintiff's Exhibit 11(b). During the administrative hearing, Mr. Watkins described the Plaintiff as "an excellent employee." AHT 204.

*Comparison with Plaintiff's Predecessor*

10. A GS–12 vacancy occurred when in 1984 Simon Tran–M–Trung transferred from the Field Program Section. Simon Tran–M–Trung was a member of the Field Program Section from November 13, 1983 to December 21, 1984. AHT 310. Though formally assigned to a position entitled Civil Engineer, Simon Tran–M–Trung's position description did not call for him to perform engineering work. Plaintiff's Exhibit 4(a). Instead, it describes his responsibility for managing the division's property acquisition and services contracts program. The only engineering duty of the job was to study engineering aspects of lease revisions and surveys to reflect changed conditions at the FAA. Plaintiff's Exhibit 4(a).

11. It is undisputed that the description called for him to perform, and he did in actuality perform, each of the following duties:

a. Processing government Procurement Requests (PR's);

b. Processing lease renewal contracts;

c. Preparing various studies pertaining to the FAA's contracting-out program (designated the A–76 program);

d. Assisting in securing, through the FAA's depot system, replacement parts for facilities located in the Southern region;

e. Administering the FAA's contract program for chairs used by controllers in the region;

f. Preparing reports pertaining to the acquisition and disposition of property.

Plaintiff's Exhibit 4(a), 19(a), 20(a), 20(b), 20(c) and 22(a). The position necessitated knowledge of engineering, government contracting requirements, familiarity with FAA budgeting and accounting procedures, and sufficient technical knowledge of FAA-required structures and devices to appropriately act upon the requested acquisitions and lease renewals. Coordination among various FAA regional officials was often a necessity.

12. During his tenure, Simon Tran–M–Trung coordinated the approval of 1118 PR's. Plaintiff's Exhibit 19(c). The PR's came from among the 96 field and sector offices within the eight southeastern states of the Southern Region. The requests were for either goods or services needed by the FAA office seeking approval of the requests.

13. Sample PR's actually processed by Tran–M–Trung included large security guard service contracts and small ones such as one for a pest control service. Plaintiff's Exhibit 20(c). Tran–M–Trung was shown to have handled the very same kind of pest control PR, telephone service PR, garbage service PR, armed guard service PR, and a janitorial service PR that the Plaintiff later handled. Compare Plaintiff's Exhibit 20(c) and 20(d). So extensive was the regulation in this area, that he even had to approve the use of antistatic carpet spray at one of the FAA offices. Plaintiff's Exhibit 20(e).

14. In acting upon the PR's, Tran–M–Trung was required to follow a detailed administrative approval process. Plaintiff's Exhibit 21(a).

15. Because of the sheer volume of work and the need to keep track of it, the Field Program Section maintained a run-

ning log of the PR's processed. Plaintiff's Exhibit 20(a) and 20(b). Tran–M–Trung himself entered upon the log details concerning many of the requests received from the field and processed by him.

16. Of the 1118 PR's he processed, only 15 required referrals to the FAA environmental engineering office, the office responsible for deciding upon any engineering question arising from the PR. Plaintiff's Exhibits 19(c). There is no evidence that even one referral was avoided because of his activity in "[s]tudy[ing] engineering aspects of lease revisions and surveys to reflect changed conditions at FAA facilities." *See* Plaintiff's Exhibit 4(a).

17. In addition to his responsibility over the Southern region's PR approval process, Tran–M–Trung also processed lease renewals. Of the approximately 1600 leases existent in the region at any given time, 90 to 120 leases were renewed each year. Plaintiff's Exhibit 23. As in the case of the PR approval process, the renewal of those leases was accomplished in accordance with FAA Orders and procedures. Plaintiff's Exhibit 24.

18. Finally, Simon Tran–M–Trung was responsible for the preparation of reports and studies regarding contract-related issues, including studies involving the FAA's A–76 program, Plaintiff's Exhibit 22(a), and for the administering of the Southern Region's air traffic controller chair repair contracts. Plaintiff's Exhibit 22(c).

19. Simon Tran–M–Trung's official position description did not require him to prepare, revise, or otherwise create engineering drawings or produce any engineering work product. Plaintiff's Exhibit 4(a). Instead, the description refers to him as an "engineering consultant" and narrowly specified that he was expected to "[s]tudy engineering aspects of lease revisions and surveys to reflect changed conditions at FAA facilities ..." *Id.* Therefore, though he was trained as an engineer, Simon Tran–M–Trung's official position description did not call for him to perform engineering duties.

20. Because the work continued after Simon Tran–M–Trung's departure, the sec-

tion supervisor, Mr. Watkins, took steps to fill the vacancy. On December 18, 1984, he certified to the FAA personnel office that the vacancy should be filled with a replacement GS–12 position, the same grade as Simon Tran–M–Trung. Plaintiff's Exhibit 6(a). His certification was made despite the fact that he had retitled the position from Civil Engineer to Program Analyst and had removed all references to engineering in the description. Raymond C. Shipley, the Plaintiff's co-worker and an Acting Section Supervisor during the relevant time period, testified about conversations he had with Mr. Watkins in which Watkins expressed the opinion that the grade should be GS–12, just as Tran–M–Trung's had been. Trial Transcript, Vol. I at 113–114 (hereinafter "TT 1:113–114").

21. On May 26, 1985, the FAA selected the Plaintiff for the vacancy, but the grade was lowered to GS–11. As with her predecessor, the Plaintiff's primary responsibility involved the property acquisition and services contracts program, including the management of PR's and lease renewals. Unlike her predecessor, however, she has the additional responsibility of preparing statistical analyses and reports. She has remained in the same position, at the GS–11 grade-level at all times since May 26, 1985. Unlike her prior position, where she served as a staff assistant, the Program Analyst position put the Plaintiff in full charge of her program.

22. She performed each duty, described in Finding of Fact 11, which had been performed by her predecessor. TT 1:19–20, 27–47 (the PR function), 47–53 (the lease renewal function), 53–55 (the A–76 function), 55–56 (the controller chair repair function), 56–57 (supply support function), 57 (miscellaneous reports function). In her first year, she processed 891 PR's; in her second 1043. Plaintiff's Exhibit 19(b). The PR's have been of the same variety as her predecessor. Plaintiff's Exhibit 20(d). Lease renewals have continued at the same rate as under Simon Tran–M–Trung. Plaintiff's Exhibit 23. She prepared an extensive A–76 contracting-out report. Plaintiff's Exhibit 22(b). She provides the

supply support to the FAA depot. AHT 22–30. She continues to administer the air traffic controller chair contracts. Plaintiff's Exhibit 22(d). In short, the job has continued with virtually identical duties and responsibilities.

23. The Plaintiff's performance has remained at the same high level since she assumed the Program Analyst position. She received an "Exceptional" Performance rating for her first year, 5/13/85 to 5/13/86, in the Program Analyst job. Plaintiff's Exhibit 11(a). She was rated as "outstanding" in her handling of the primary duty of analyst management of the property acquisition and services contracts program. Plaintiff's Exhibit 11(a), Element 2 at 2a.

24. As justification for the lower grade, the FAA relies upon a job evaluation report. Plaintiff's Exhibit 5(a). Inexplicably, the evaluation report mentions nothing about the processing of PR's nor lease renewals even though that was the most time-consuming part of the job.

25. Since May 26, 1985, the Plaintiff has performed substantially equal work to that performed by her predecessor, Simon Tran–M–Trung. The skill, effort, and responsibility required in the performance of the two jobs is, and has been, substantially equal. Plaintiff's Exhibits 1(b), 3(a) and (b), 4(a) and (b), 6(a), 9, 12, 13, 19–24.

26. The Plaintiff testified that she observed Tran–M–Trung doing the same things she later had to do. TT 1:21. The Plaintiff worked in the section as an Engineering Statistician during Tran–M–Trung's tenure. She occupied an adjacent desk and was in a position to observe his work. TT 1:20. She also knew what PR processing entailed generally because earlier in her FAA career she had prepared PRs for submission to the regional office. TT 1:22.

27. Plaintiff's co-worker Raymond C. Shipley testified that the work performed was "essentially the same." TT 1:109. Mr. Shipley was in a position to observe the equality of the work. He began in the section in 1980 and worked continuously there up to the time of the trial. TT 1:101.

He was there during Tran–M–Trung's entire tenure. TT 1:108. He served as acting section chief, both for two months of the six month period immediately before the arrival of Mr. Watkins into the section and thereafter for approximately two weeks a year during Watkins' absences. TT 1:105, 108, 117. As a supervisor, he was required to familiarize himself with the overall functions of the section and enough about each employee's role to assign work. TT 1:105.

28. Section Secretary Theresa Simpson testified that the duties and responsibilities the Plaintiff performed actually exceeded those performed by Tran–M–Trung. TT 1:129–130. Because she worked very closely with Tran–M–Trung, she was able to observe his work and as the sole section secretary, all of his work crossed her desk so that she was fully familiar with what he did on a day-to-day basis. TT 1:121. Further, she maintained the Procurement Request Log, evidencing the extent of Tran–M–Trung's involvement in the processing of PRs. TT 1:122 and Plaintiff's Exhibits 20(a) and (b).

29. Carol V. Lemki, an FAA Budget Analyst, testified that Tran–M–Trung and the Plaintiff handled PRs and the administration of the air traffic controller chair repair contract substantially the same way. TT 1:93.

30. Even Mr. Watkins conceded that the Plaintiff and Tran–M–Trung both spent approximately 70 percent of their time on the exact same logistics functions. TT 2:14–15. "Logistics" functions refer to procurement requests, leases and other contract related items. TT 1:110.

31. The evidence demonstrates that at the time Tran–M–Trung was assigned to Plaintiff's office, no engineering functions were delegated to that section. Plaintiff's Exhibit 3(a) at 1–2. Plaintiff's Exhibit 3(a). In fact, Mr. Shipley testified that "[w]e were excluded from doing engineering duties." TT 1:107. Both Shipley and Ms. Simpson testified that Tran–M–Trung was properly told not to perform engineering work because responsibility for the performance of engineering work lay in other

sections. TT 1:110–111 (Shipley); TT 1:127 (Simpson).

32. The evidence showed that Tran–M–Trung had engineering expertise which he had used in his previous job in another section. He moved to the Field Program job in which engineering expertise was largely superfluous but was sometimes helpful in that he had a superior appreciation for the engineering tasks that would have to be performed elsewhere. Even after he moved to Plaintiff's office, Tran–M–Trung continued to perform engineering work for his old section as a courtesy. TT 1:101–111. As noted above, Tran–M–Trung was cautioned to stop doing this work for sections not his own. TT 1:110–111; TT 1:127.

33. Only a small number of the PRs Tran–M–Trung worked on as a part of Plaintiff's section involved any engineering consideration. Mr. Watkins testified that engineering considerations would come into play in a PR "if we had a construction situation coming in." TT 1:195. He also testified that in an unspecified number of "lease situations," Tran–M–Trung performed work such as assisting real estate personnel in "analyzing the property" and reviewing "metes and bounds" legal descriptions. TT 1:196. He asserted that surveys were "performed ... in some cases." Though Mr. Shipley testified that Tran–M–Trung did not do such surveys for the section, the defendants offered no evidence of work product to corroborate Mr. Watkins' assertion and none appeared on the logs. AHT 116. The only documentary evidence shows that during the 13 months he was on the job, Tran–M–Trung processed only 15 PRs with any engineering component out of a total of 1118. Exhibit 19(c).

34. The evidence also showed that Tran–M–Trung unquestionably had superior engineering capability to Plaintiff while Plaintiff was more skilled in executing her tasks of assuring budget compliance. Plaintiff's Exhibit 13; TT 1:94–95.

35. Simon Tran–M–Trung was not the only Field Program Section staff member to have occupied a position with the word "engineer" in the job title but whose job was essentially administrative. During Ms. McMillin's tenure, the FAA had retitled four jobs from engineer to program analyst though the positions themselves were occupied by engineers. McMillin Dep. at 17–22.

36. The engineering job titles had existed not for the purpose of describing the duties to be performed, but rather as a means of recruiting engineers to take the jobs, as explained by Ms. McMillin:

Q. Let me ask you this. Were any of those people serving in engineering positions while they were under your supervision?

A. The titles on the position were "engineering." They were called engineers. In FAA, if your source to fill the position is engineering, normally the position will be written as an engineering position, and since the Airways Facility Organization is 90% technical people, the source, whether it's a program type position or an engineering position, your source of a person to fill that position will be an engineer. And therefore if the man is an engineer, the position is normally titled under an engineering series.

Q. And that is true even though the people aren't necessarily performing engineering functions?

A. That's true.

Q. Why?

A. Because an engineer does not—it's a status thing. An engineer is a professional title, and if you can have a professional title, you don't like working on a position that doesn't give you a professional title. An engineer won't bid on a nonengineering position, because he's an engineer.

McMillin Dep. at 13–14.

37. Not only did the Plaintiff and Ms. McMillin testify that the engineers in the Field Program Section did not perform engineering duties, one of the senior engineers, Raymond C. Shipley, testified similarly. AHT 127. Mr. Shipley explained that the job of the section was really administrative:

Our section is an administrative type section. That is, we authorize, approve, or

originate paperwork or documents or that type thing. More so than we are involved in engineering activities. AHT 111–112.

38. Mr. Shipley was one of those whose job title, which had been "Program Analyst" under Ms. McMillin, was changed to Electronics Engineer by Mr. Watkins. AHT, 110. The change occurred just when the job became more administrative and less engineering oriented. *Id.*

39. Ms. McMillin, who is not an engineer, described the historical resentment the engineers, traditionally men, felt toward professional women co-workers trained in other disciplines. McMillin Dep. at 41–43. Mr. Watkins had demonstrated this resentment toward her. *Id.*

40. Mr. Shipley testified that he heard Watkins on several occasions remark that women should be at home and not in the workplace. TT 1:115–116. Ms. Simpson testified that she had heard Watkins remark the "women should look for a good husband that could support them." TT 1:130. She also testified that he had expressed negative comments about women who work versus women who stay at home with children. AHT 181. The Plaintiff testified about similar comments made the same month he was engaged in seeking her promotion. TT 1:62–63.

41. The substantial equality of the work actually performed by the Plaintiff and her male predecessor in Atlanta is further demonstrated by the following evidence:

(a) A comparison of the wording of the position descriptions of the Plaintiff and Simon Tran–M–Trung. Plaintiff's Exhibits 4(a) and 4(b). Functional statements and position descriptions are important organizational indications of the duties of employees, as explained by a high-ranking FAA Washington official, Anita Tripp whose deposition was admitted in lieu of live testimony. Tripp Dep. 9–10. The FAA expects all significant functions to be listed in the functional statement:

Q. Would I be correct that you try to include in a functional statement everything that is of significance to be performed within an office?

A. That is the intent, yes.

Q. So, for instance, if an office was expected to perform engineering functions, you would expect to find some description of those engineering functions in the actual functional statement; would that be correct.

A. I would expect at a minimum to find that engineering functions are expected but not necessarily a detailed description of those functions and how they occur.

Tripp Dep. at 18. Because "significant" duties are to be listed in an organization's functional statement, the absence of a duty tends to show that the duty is not a significant one.

The FAA's own EEO Counsellor compared the duties and found that with the exception of a half-sentence deleted from the Civil Engineer position description "all other duties in the job description [were] given to Ms. Parker." Plaintiff's Exhibit 13, page 1;[3]

(b) The Plaintiff's testimony regarding what she actually does in the Program Analyst position and the duties she observed being performed by Simon Tran–M–Trung;

(c) The similarity in the actual work product produced, revealed by the comparable numbers of procurement requests and lease renewals processed and the similarity of studies undertaken under the management of each [Plaintiff's Exhibits 19(a) and (b), 20(a) and (b), 21(a) and (b), 22(a)(b)(c) and (d) and 23];

(d) The applicability of the same processing procedures for Procurement Requests under both [Plaintiff's Exhibit 21(b)];

(e) The testimony of Raymond C. Shipley, the Plaintiff's co-worker and an Acting Section Supervisor during the relevant time period, that the work was substantially the same [AHT 117–118];

---

**3.** The deleted portion of the description read: "[s]tudy engineering aspects of lease revisions and surveys to reflect changed conditions at FAA facilities ..." Plaintiff's Exhibit 4(a).

(f) Mr. Watkins' 12/18/84 certification that the same GA–12 grade be assigned to the new job despite the removal of all references to engineering [Plaintiff's Exhibit 6(a)];

(g) The 4/2/84 FAA functional statement, containing a description of the functions performed in the section, which remained unchanged even after Simon Tran–M–Trung vacated the position. [Plaintiff's Exhibit 3(a)]. The functional statement omits any reference to the performance of engineering work by the section.

(h) The 2/5/85 FAA organizational chart (prepared after Simon Tran–M–Trung vacated the position) identifying the following functions for the position of Civil Engineer:

Logistics Coordinator/Janitorial and Minor Maintenance Contracts/PR's Lease Renewals/Domore chair.

[Plaintiff's Exhibit 1(b)]. Significantly, the description makes no mention of any engineering component, even though the position title would suggest otherwise. The position title is not indicative of the kind of work a "Civil Engineer" was expected by the FAA to perform in the position in question;

(i) The 8/16/84 FAA manpower utilization memorandum issued by Mr. Watkins at the time Simon Tran–M–Trung occupied the position. The same functions, those described in numbered paragraphs 1–3, were performed by Simon Tran–M–Trung and by the Plaintiff [Plaintiff's Exhibit 9]. As in the case of both the functional statement and the position descriptions, the manpower memorandum says nothing about the performance of any engineering work by the section.

*Comparison with Chicago Positions*

41a. Plaintiff also compares her position to the GS–13 position held by Walter Daigle and later William Hawke in the FAA's Great Lakes Region. However, the evidence demonstrates that this position does not require substantially equal work to that performed by Plaintiff.

42. Mr. Hawke was given program management responsibility which the evidence showed meant he was "given the authority to decide how best to accomplish a certain project in a certain area without a great deal of supervision, without any supervision, as a matter of fact, and accomplish it." TT 2:89.

43. Mr. Hawke spent 75 to 85% of his time on space management and recurring contracts. TT 2:88. The recurring contracts program was an effort to save money and cut costs by doing a price and cost analysis on large recurring contracts such as contracts for boilers, water chillers, air conditioners and air handling units in some control towers, elevator maintenance contracts and janitorial contracts, to reduce the frequency and thus bring down the cost, yet do an effective job. TT 2:90.

44. Mr. Hawke would look at the specifications and do a price and cost analysis on the contract. TT 2:91. Where he believed the price to be too high, he would reduce the task, rewrite the specifications and do another price and cost analysis "until it got down to a dollar value we could live with." TT 2:91. At that point he would assemble the specifications and have the contracting officer go out and get and contract. TT 2:92. To do this work required engineering experience and a knowledge of plant maintenance, including heating systems, boilers, air conditioning systems and electrical systems. TT 2:93.

45. Mr. Hawke also managed all administrative and technical space for the air traffic control system in the Great Lakes Region. TT 2:93–94. For technical space, Mr. Hawke would meet with people from the division or branch involved and come up with a conclusion as to how much space would be needed. TT 2:95. He would also make the final decision. TT 2:95.

46. The evidence showed that the remainder of Mr. Hawke's time was spent on inquiries from the field as to methods and procedures on how to develop the special maintenance projects and some general questions on fiscal matters. TT 2:88. Mr. Hawke would advise the field on "what would be the most effective technically and cost effective method to accomplish the project." TT 2:89.

47. Walter Daigle had similar expertise to that of Mr. Hawke and managed the programs for which he was responsible. Mr. Daigle testified that his principal work was managing the maintenance projects program and the productivity improvement program, the A–76. TT 2:54. He estimated that he spent 35% of his time doing special maintenance and 40% on A–76. TT 2:54.

48. Mr. Daigle's work was keeping "the program running on a day-to-day basis and at the same time keeping the budget part of it going from the three year cycle." TT 2:56.

49. Mr. Daigle's work on A–76 consisted of finding the jobs in field maintenance that could be contracted out and then determining the duties that were part of the previous in-house job that had to be covered by the outside contractor. TT 2:60. Mr. Daigle had to get "the specifications written for all of those jobs up to the procurement in a certain amount of time to contract out this work." TT 2:60. He was responsible not only for undertaking the study that would decide whether to contract a project out and for implementing the decision once it was made. TT 2:78.

50. Plaintiff contends that the work performed in Atlanta and Chicago is the same because the functional responsibility in each location is the same. However, Plaintiff failed to produce sufficient evidence to establish that *her* job duties and work performed was substantially equal to that performed by Hawke and Daigle. Although Hawke and Daigle were also involved in processing numerous PRs, Plaintiff was unable to refute their testimony regarding the additional management functions and responsibilities that they performed. This additional responsibility applying their technical knowledge in areas such as testing, rewriting specifications and assessing actual space management set Hawke and Daigle's job apart from that of the Plaintiff. The record evidence supports defendants' contention that Plaintiff did not have the technical knowledge necessary to select working or test equipment or evaluate requests from the filed for such equipment.

Plaintiff's citations to the record do not refute this finding. TT 3:31–33. Likewise, Plaintiff could not demonstrate that she had or could determine space allocation in buildings; an important task performed by Hawke and Daigle. *Both* of Plaintiff's supervisors testified that Plaintiff did not do the work done by Hawke and Daigle. TT 3:54; 1:19–55; 1:23; 1:12–79; 1:20. Mr. Quinby testified that Plaintiff never did program management. TT 3:69.

### Classification Act and Administrative Procedure Act Claims

51. The FAA, in classifying positions located within the Southern Region, does not compare positions within the Southern Region to any position located in any other region of the FAA. Plaintiff's Exhibit 16, Response to First Request for Admission ¶ 23; AHT 270.

52. In the Plaintiff's specific case, Earl T. Gross, the FAA's position classifier who prepared the evaluation report on the Plaintiff's job, Plaintiff's Exhibit 5(a), acknowledged that he made no effort to compare the two jobs in Atlanta and the Great Lakes:

Q. In making the evaluation—In preparing the Evaluation Statement which is Complainant's Exhibit No. 7, did you make any comparison of any position which might be like it in any other Region?

A. No.

Q. Why did you not do that?

A. I didn't think it was necessary, I didn't know if another Region had one.

Q. Could you explain why you didn't know that? Is it because there is no system in place for determining that?

A. No, each Region can really be different.

Q. And then, I guess my question is how do you know that the classifier in the Atlanta or Southern Region is classifying a like kind position the same way as a classifier in another Region?

A. I really don't.

Q. Would it be fair to say that you have no idea whether the position—that is the Program Analyst position—in the South-

ern Region operated in a substantially equivalent manner with a position in the Great Lakes Region?

A. I wouldn't know that.

AHT 270–271.

53. At all times material to this action, the FAA's position classification within the Southern Region has been accomplished by Regional Classification personnel who do not compare the position being classified with either a predecessor position or a position in another region that is claimed to be a counterpart. AHT 290.

*Title VII Claim*

54. In addition to the evidence showing wage discrimination and the denial of equal pay for equal work, the Plaintiff has also presented evidence indicating that the FAA, through its agents and employees, has intentionally discriminated against the Plaintiff on account of her sex. First, Mr. Gross, the author of the evaluation report on which the government now relies, was found by the FAA itself in 1983 to have allowed his stereotyping of females to affect his decisions on the proper grade to be assigned to positions occupied by women:

> Rather than being classified without regard to encumbency, it appears complainant's encumbency was a factor in the classification which resulted in or led to a stereotyping based on sex of the new position as a clerical one.

Plaintiff's Exhibit 15, page 15 (a conclusion adopted by the DOT on page 2 of the exhibit).[4]

55. Mr. Gross has acknowledged that he knew in 1985 that a woman, the Plaintiff, was going to be assigned to the position he was classifying. AHT 275–277. The FAA has offered no explanation for Mr. Gross' inaccurate description of the Plaintiff's job. Plaintiff's Exhibit 5(a).

56. Plaintiff's supervisor also displayed discriminatory animus toward working women contemporaneous to Plaintiff's fail-

ure to obtain a promotion. *See* Finding of Fact 39–40.

57. Statistical evidence showed that the higher graded positions in the Maintenance Program Branch were virtually all held by male engineers. The Plaintiff, one of the few professional-grade employees who was not an engineer, has been the highest graded female in the entire Branch, following Ms. McMillin's departure in September 1982. Plaintiff's Exhibit 8.

58. A federal employee has a right to file an appeal of a grade-determining decision such as that made by Mr. Gross. However, in such an appeal, the sole issue is whether a particular classification decision conforms to a classification standard, and not whether the agency consistently applies that standard. AHT 271, 290. Therefore, given the nature of Plaintiff's claim, namely that sex discrimination had affected the classification process, such an appeal afforded her no remedy for her complaint.

59. Instead and in accordance with 42 U.S.C. § 2000e–16 and 29 C.F.R. § 1613, the Plaintiff filed an "informal" administrative complaint on July 25, 1985, alleging that the FAA had discriminated against her in promotions and compensation.

60. On March 10, 1987, the Department of Transportation issued a decision which notified the Plaintiff of her right to file an action within 30 days of her receipt of the decision.

**B.** *Conclusions of Law*

1. The defendant James Burnley is a Secretary of the United States Department of Transportation and the defendant T. Allan McArtor is the Administrator of the Federal Aviation Administration. Both are proper defendants to this action.

2. This action was timely commenced and all conditions precedent to the maintenance of this action have been met in accordance with 42 U.S.C. § 2000e–16.

---

**4.** Such evidence is relevant in ascertaining the state of mind of the employer. *Conway v. Electro Switch Corp.,* 825 F.2d 593, 597–598 (1st Cir.1987); *See Furr v. AT & T Technologies, Inc.,* 824 F.2d 1537, 1543 (10th Cir.1987); *Mathewson v. National Automatic Tool Co., Inc.,* 807 F.2d 87 (7th Cir.1986).

3. In the federal service, an employee's pay is based upon the grade of the position occupied. 5 U.S.C. § 5101. A General Schedule ["GS"] position is graded or classified using standards which are applicable nationwide. 5 U.S.C. § 5104. Basic pay is to be determined upon the principle of equal pay for substantially equal work. 5 U.S.C. § 5101(a). Variations in basic pay are permitted in proportion to the existence of substantial differences in the difficulty, responsibility, and qualification requirements of the work performed. 5 U.S.C. § 5101(b). Where the positions themselves require materially different qualifications reflected in testing and selection standards, pay differentials will be justified. *Jarecki v. United States*, 590 F.2d 670, 678–679 at n. 12 (7th Cir.1979), *cert. denied* 444 U.S. 829, 100 S.Ct. 55, 62 L.Ed.2d 37 (1979).

4. Under the Equal Pay Act of 1963, 29 U.S.C. § 206(d), an employer, including a federal employer, is obligated to provide equal pay for "equal work on jobs the performance of which requires equal skill, effort and responsibility and which are performed under similar working conditions." 29 U.S.C. § 206(d)(1); *Grayboff v. Pendleton*, 35 EPD ¶ 34,773 (N.D.Ga.1984) (Judge O'Kelley).

5. The relevant inquiry on the equal work issue is whether the jobs to be compared have a "common core" of tasks such that a "significant portion" of the two jobs is identical. *Brewster v. Barnes*, 788 F.2d 985, 991 (4th Cir.1986). The inquiry then turns to whether the differing or additional tasks make the work substantially different. *Id., citing, Brobst v. Columbus Services International*, 761 F.2d 148, 156 (3rd Cir.1985) and *Brennan v. Prince William Hospital Corp.*, 503 F.2d 282, 285–286 (4th Cir.1974), *cert. denied*, 420 U.S. 972, 95 S.Ct. 1392, 43 L.Ed.2d 652 (1975).

■ 6. In determining whether a woman is paid less for a job "substantially equal" to a man's, the courts examine the jobs rather than the job title or description. *E.E.O.C. v. Hernando Bank, Inc.*, 724 F.2d 1188, 1196 (5th Cir.1984), *citing Hodgson v. Behrens Drug Co.*, 475 F.2d 1041 (5th Cir.

1973); *Marshall v. Building Maintenance Corp.*, 587 F.2d 567, 571 (2d Cir.1978).

■ 7. Only the skills actually required by those jobs, and not the abilities of the persons in those positions are relevant. *Goodrich v. International Brotherhood of Electrical Workers, AFL–CIO*, 815 F.2d 1519, 1524 (D.C.Cir.1987), *citing Hein v. Oregon College of Education*, 718 F.2d 910, 914 (9th Cir.1983).

As the Eleventh Circuit recently held:

> It is important to bear in mind that the prima facie case is made out by comparing the *jobs* held by the female and male employees and showing that these jobs are substantially equal, not by comparing the skills and qualifications of the individual employees holding those jobs.

*Glenn v. General Motors Corporation*, 841 F.2d 1567, 1569 (11th Cir.1988) (quoting *Brock v. Georgia Southwestern College*, 765 F.2d 1026, 1032 (11th Cir.1985)) (emphasis in original).

■ 8. The controlling question is whether the actual job content is substantially equal. *Van Heest v. McNeilab, Inc.*, 624 F.Supp. 891, 897 (D.Del.1985). Furthermore, the Plaintiff need not compare herself to all similarly classified males, but may choose one or more among them, so long as substantially equal work is involved. *Goodrich, supra*, 815 F.2d at 1524.

9. In the federal government, the performance of work outside of one's designated position does not generally entitle the employee to any additional pay:

> [T]he federal employee is entitled to receive only the salary of the position to which he was appointed, even though he may have performed the duties of another position or claims that he should have been placed in a higher grade.

*United States v. Testan*, 424 U.S. 392, 406, 96 S.Ct. 948, 957, 47 L.Ed.2d 114 (1976). The "engineering" work Tran–M–Trung performed for his old section while in his new position thus cannot form a legal basis for grading his employment as GS–12 or grading Plaintiff's position as GS–11.

10. A claimant who establishes a violation of the Equal Pay Act also establishes a violation of Title VII's prohibition against sex discrimination in compensation under 42 U.S.C. § 2000e-2(a)(1); *McKee v. Bi-State Development Agency,* 801 F.2d 1014, 1018-1019 (8th Cir.1986); *Futran v. RING Radio Co.,* 501 F.Supp. 734, 740 (N.D.Ga.1980) (Judge Vining); *Burdine v. Texas Department of Community Affairs,* 608 F.2d 563 (5th Cir.1979); *Orr v. MacNeill & Son, Inc.,* 511 F.2d 166 (5th Cir.1975); *see County of Washington, Oregon v. Gunther,* 452 U.S. 161, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981).

11. Title VII and the Equal Pay Act are to be read in *pari materia* and neither should be interpreted in a manner that would undermine the other. *See Laffey v. Northwest Airlines, Inc.,* 567 F.2d 429, 444 (D.C.Cir.1976); *Orr v. Frank R. MacNeill & Son, Inc.,* 511 F.2d 166 (5th Cir.1975), *cert. denied,* 423 U.S. 865, 96 S.Ct. 125, 46 L.Ed.2d 94 (1975); *Hodgson v. Brookhaven General Hospital,* 436 F.2d 719 (5th Cir.1970).

12. In proving a wage discrimination violation under either the Equal Pay Act or Title VII, the employee has the initial burden of proving "equal work" and higher wages to members of the opposite sex. Once the employee has thus established a *prima facie* case, the burden of proof to establish one of the Acts four affirmative defenses falls upon the employer. *Corning Glass Works v. Brennan,* 417 U.S. 188, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974); *Gosa v. Bryce Hospital,* 780 F.2d 917, 918 (11th Cir.1986); *see Kouba v. Allstate Insurance Co.,* 691 F.2d 873 (9th Cir.1982). This proof formula is equally applicable to a Title VII claim. *Orr, supra; Ammons v. Zia Co.,* 448 F.2d 117 (10th Cir.1971).

13. An employee, in proving her *prima facie* case, need not prove the duties performed are identical to that of a male, but rather that the skill, effort and responsibility required in the performance of the job is substantially equal. *Pearce v. Wichita County,* 590 F.2d 128, 133 (5th Cir.1979), *Brennan v. J.M. Fields, Inc.,* 488 F.2d 443 (5th Cir.1973), *Brennan v. City Stores, Inc.,* 479 F.2d 235, 238-239 (5th Cir.1973). The Plaintiff has presented ample evidence of the substantial equality of her job and that of Simon Tran-M-Trung. In fact, the court concludes that the Plaintiff has established that her position and that of her predecessor are virtually identical. However, the Plaintiff has failed to persuade the court under the appropriate standards of the substantial equality of her job and that of Mr. Daigle and Mr. Hawke in the Great Lakes region.

14. An employer which pays a female less than a male predecessor for performing substantially equal work violates the Equal Pay Act and Title VII unless the employer can legally justify the pay disparity. *EEOC v. First Citizens Bank of Billings,* 758 F.2d 397 (9th Cir.1985); *Bourque v. Powell Electrical Manufacturing Co.,* 617 F.2d 61 (5th Cir.1980); *Pearce, supra* at 133; *Hodgson v. Behrens Drug Co.,* 475 F.2d 1041, 1049 (5th Cir.1973), *cert. denied,* 414 U.S. 822, 94 S.Ct. 121, 38 L.Ed.2d 55 (1973). Since Simon Tran-M-Trung performed substantially equal work to that of the Plaintiff, violations of both Acts have been established unless the FAA proves one of the four affirmative defenses.

15. The defendants argue, by way of affirmative defense, that the wage differential between the Plaintiff and the males resulted from its application of a pay classification system. The FAA has failed to satisfy its burden of proving the validity of this defense, however. *Gosa, supra.*

16. The defendants' failure to show that the pay classification system was applied in a nondiscriminatory manner is fatal to their case. *Grumbine v. United States,* 586 F.Supp. 1144 (D.D.C.1984) and *Cayce v. Adams,* 439 F.Supp. 606 (D.D.C.1977). Only a *bona fide* classification system is permissible under 29 U.S.C. § 206(d)(1):

> ... however 'bona fide' the Civil Service Classification system appears on paper, if it is not applied in a sex-blind manner, differences are not entitled to exemption from the operation of the Equal Pay Act. A classification system reflecting differ-

ences based on sex, whether as drafted or as applied, cannot be bona fide.

*Cayce,* 439 F.Supp. at 608. To be a bona fide job classification system, the system must be gender-neutral in its application. *Molden v. United States,* 11 Cl.Ct. 604, 612 (1987).

17. The defendants are required to apply their pay classification system in a uniform manner:

> ... the entire point and purpose of the various civil service laws is to provide uniformity of treatment for all its employees, regardless of location.

*Grumbine, supra,* 586 F.Supp. at 1149.

18. Likewise, Plaintiff contends that when the government fails to apply its pay classification system in a sex-blind manner, it violates the Classification Act of 1949, 5 U.S.C. § 5101. That Act itself incorporates the equal pay for equal work principle:

> It is the purpose of this Chapter to provide a plan for classification of positions whereby—
> (1) in determining the rate of pay which an employee will receive—
> (A) the principle of equal pay for equal work will be followed ...

5 U.S.C. § 5101. Thus, the Plaintiff seeks declaratory judgment that defendants violated the Classification Act and also seeks declaratory judgment that defendants violated the Administrative Procedure Act, 5 U.S.C. § 701 *et seq,* by arbitrarily and capriciously deciding to pay the Plaintiff at a lesser rate of pay.[5]

19. The defendants do maintain a practice of refusing to compare positions in different regions in making individual position classification decisions. The defendants also maintain a practice of refusing to compare a position with a predecessor position in arriving at a classification decision. Plaintiff contends that the defendants' practice of classifying positions without

comparing substantially equivalent positions in other regions or without comparing a position with a substantially equivalent prior position violates Plaintiff's rights under Title VII, the EPA, the Classification Act and the APA. Assuming that these practices, as applied in the case of the Plaintiff, violate the Plaintiff's rights under the Classification Act, the APA, the EPA and Title VII, Plaintiff has nonetheless failed to establish a meritorious claim in comparing her job to that of Hawke and Daigle in Chicago.

### *Promotion Claim*

■ 20. In addition to her compensation discrimination claim, Plaintiff also has proven a violation of her rights under Title VII by virtue of the proof regarding the defendants' refusal to promote her to a GS–12 Program Analyst in May 1985 because of her sex. This claim is measured in accordance with the traditional Title VII disparate treatment proof formula. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 251, 101 S.Ct. 1089, 1092, 67 L.Ed.2d 207 (1981); *Roberts v. Gadsden Memorial Hospital,* 835 F.2d 793 (11th Cir.1988).

21. A federal employee making an allegation of sex discrimination in the type of promotion system here establishes a *prima facie* case of sex discrimination by demonstrating each of the prongs of the appropriate variant of the traditional *McDonnell Douglas* standard:

> (a) that she belongs to a class of persons protected by Title VII; (b) that she was qualified for promotion and might have reasonably expected to be promoted under the defendant's promotion system; (c) that she was not promoted; and (d) that the supervisory level employees having responsibility to exercise judgment

---

**5.** To the extent that the court finds a violation of the Equal Pay Act and of Title VII the court agrees that Plaintiff has technically shown a violation of the principles of the Classification Act and the Administrative Procedures Act as well. Although the court agrees in principle with Plaintiff's characterization that failure to compare Plaintiff's job with other similar positions government-wide is a violation of the Classification Act and the Administrative Procedure Act, as well as the Equal Pay Act, because the court finds that Plaintiff's claims based on a comparison with the position in Chicago are meritless, the court need not reach this question.

under the promotion system betrayed a disposition towards discrimination. *Snead v. Harris,* 23 EPD ¶ 30,927 (D.D.C. 1980) at 15, 772; *Epstein v. Secretary, United States Department of Treasury,* 739 F.2d 274 (7th Cir.1984); *Haire v. Calloway,* 572 F.2d 632 (8th Cir.1978); *see McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 801, 93 S.Ct. 1817, 1823, 36 L.Ed. 2d 668 (1973) (setting forth the traditional standard applicable to situations where a Plaintiff is not seeking promotion by upgrade of her classification).

22. If the employer thereafter articulates some legitimate, nondiscriminatory reason for the failure to promote or to reclassify the job, the Plaintiff must show that the defendant's proffered reason is not believable or that the defendant was more likely than not motivated by a discriminatory reason. *E.E.O.C. v. Exxon Shipping Co.,* 745 F.2d 967, 972 (5th Cir.1984); *see McDonnell Douglas supra.*

23. Under the traditional Title VII proof formula, the Plaintiff has shown that she is a woman, that she is qualified for and was selected for a position, a position for which her supervisor had recommended her for a GS–12 promotion. *See, Nord v. United States Steel Corp.,* 758 F.2d 1462, 1467 (11th Cir.1985).

24. Plaintiff has also demonstrated that both officials involved in her promotion process have displayed discriminatory animus toward women, including the Plaintiff. The Plaintiff's promotion was denied under a system which required action by two persons: (a) a supervisor who writes the job description and recommends the promotion; and (b) a personnel officer whose job it is to classify the job at a higher grade level if warranted. Mr. Watkins, Plaintiff's supervisor did submit a request to promote Plaintiff to the desired GS–12 position on December 18, 1984. Plaintiff's Exhibit 6(a). Personnel officer Earl T. Gross refused to classify the job at the GS–12 level.

25. In 1983, the FAA itself determined that Mr. Gross had allowed a stereotyped view of women to have affected one of his classification decisions. Plaintiff's Exhibit 15 at 19. *See Reaves v. Marsh,* 658 F.Supp. 1268 (E.D. Ark. 1987) (finding such evidence significant).

26. Gross' classification decision in this case further indicates this animus. Given the evidence presented at trial, his evaluation statement completely understates Plaintiff's job duties. Plaintiff's Exhibit 5(a). The statement omits any reference to what the parties agree comprises 70% of the job; the logistics function discussed earlier. Gross explained that his understanding of Plaintiff's job came from his discussion with Mr. Watkins, Plaintiff's supervisor. Thus, Watkins' attitudes are relevant.

27. The evidence revealed that Watkins expressed a negative attitude toward working women. Mr. Shipley testified that he heard Watkins on several occasions remark that women should be at home and not in the workplace. TT 1:115–116. Ms. Simpson testified that she had heard Watkins remark the "women should look for a good husband that could support them." TT 1:130. She also testified that he had expressed negative comments about women who work versus women who stay at home with children. AHT. The Plaintiff testified about similar comments made the same month he was engaged in seeking her promotion. TT 1:62–63. Finally, Ms. McMillin testified that as a member of the evaluation staff, she had been exposed to Watkins' animus toward women. She went on tho describe the resentment that engineers, traditionally men, felt toward women co-workers trained in other disciplines. McMillin Dep. at 41–43.

28. Further, Plaintiff showed that after Mr. Gross received the December 18, 1984 promotion request for Plaintiff, he advised Mr. Watkins that the *division* could have only one GS–12 Program Analyst, the position Plaintiff held, and that the division already had one. Defendants were able to offer no rationale for this *ad hoc* quota such as budgetary constraints. Moreover, Plaintiff was able to show that no such quota was applied to the engineering positions which men in the division occupied. TT 2:13. All of the GS–12 and GS–13 posi-

tions in the Maintenance Program *branch* for example were occupied by men. Plaintiff's Exhibit 8. This branch was only one of four branches in the division.

29. Finally, these same statistics reveal the complete absence of women from higher graded positions within the branch. Plaintiff's Exhibit 8. Of the 32 persons occupying positions in the Maintenance Program Branch at the GS–12 and GS–13 level every one is a male. The Plaintiff is in fact the only GS–11 in the branch. Such statistics are supportive of the Plaintiff's individual claim. *Carmichael v. Birmingham Saw Works*, 738 F.2d 1126, 1131 (11th Cir.1984); *Watson v. Fort Worth Bank and Trust*, — U.S. —, — – —, 108 S.Ct. 2777, 2786–2792, 101 L.Ed.2d 827 (1988); *Davis v. Califano*, 613 F.2d 957, 962–965 (D.C.Cir.1979); *see generally, Pettway v. American Cast Iron Pipe Co.*, 494 F.2d 211 (5th Cir.1974). As recently stated by the Fourth Circuit:

> ... statistical evidence is unquestionably relevant in a Title VII disparate treatment case. *Diaz [v. American Telephone & Telegraph Co.*, 752 F.2d 1356 (9th Cir.1985) ] *supra*, 752 F.2d at 1362. Such evidence may help establish a prima facie case and is often crucial for the Plaintiff's attempt to establish an inference of discrimination. *Id.* Such evidence may also aid the Plaintiff in showing that a 'defendant's articulated non-discriminatory reason for the employment decision in question is pretextual.' *Id.* at 1363. In a pattern and practice case, '[s]tatistical data is relevant because it can be used to establish a general discriminatory practice in an employer's hiring or promotion practices. Such a discriminatory pattern is probative of motive and can therefore create an inference of discriminatory intent with respect to the individual employment decision at issue.'

*Ardrey v. U.P.S.*, 798 F.2d 679, 684 (4th Cir.1986).

6. *See,* Finding of Fact 54.

7. Plaintiff on February 17, 1988 moved to amend the Complaint to add the claim based on the Back Pay Act. Defendants failed to respond

30. The FAA has articulated as its reason for not promoting Ms. Parker its classification decision issued by Mr. Gross. The court finds this explanation pretextual. The evaluation report does not, in fact, describe the Plaintiff's job. Since the report establishes no meritorious reason for the pay disparity, it is apparent that some non-merit reason accounts for the disparity. In light of the FAA's own 1983 finding [6] that sex stereotyping had influenced a classification decision coupled with the demonstrated animus on the part of Plaintiff's supervisory personnel, such stereotyping is the most plausible for the grossly inaccurate evaluation report and thus the failure to promote.

■ 31. Having concluded that the Plaintiff's rights have been violated, the court concludes that she is entitled to "make whole" relief. The Plaintiff is entitled to retroactive promotion to GS–12 as of May 26, 1985 with an award of back pay, interest on back pay under the recently amended Back Pay Act, 5 U.S.C. § 5596, and attorney's fees.[7] Relief should include promotion to a GS–12 as of May 26, 1985.

■ 32. The court finds that the defendants' violations were wilful within the meaning of the Equal Pay Act. *See Donovan v. Sabine Irrigation Co.*, 531 F.Supp. 923 (W.D.La.1981) (finding willfulness where employer had previously been accused of violation of this section and was sued); *Futran v. RING Radio Co.*, 501 F.Supp. 734 (N.D.Ga.1980) (Vining, J.). There is no question that the principals here were aware of the requirements of the law on this issue. Accordingly, the Plaintiff is entitled to liquidated damages, in an amount equal to the back pay and interest on back pay awarded by the prior paragraph. *Grayboff, supra* at p. 35,371 (N.D. Ga.1984).

33. Because the Plaintiff has prevailed, she is also entitled to her attorneys fees and costs. The court DIRECTS Plaintiff to

to this motion. The court GRANTS Plaintiff's motion to amend. *See* Local Rule 220–1(b)(1) (N.D.Ga.).

file an appropriate motion in accordance with Local Rule 270 (N.D.Ga.).